The Honorable Robert S. Lasnik

**FILED UNDER SEAL PURSUANT TO 3/15/10 PROTECTIVE ORDER**

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE:  PARK WEST GALLERIES, INC., MARKETING AND SALES PRACTICES LITIGATION | No. 09-MD-2076-RSL |
| THIS DOCUMENT RELATES TO:<br><br>*Bohm v. Park West Galleries, Inc., et al.*<br>Case No. C09-1178-RSL | THIRD AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

TABLE OF CONTENTS

PAGE

INTRODUCTION ...........................................................................................1

I      NATURE OF THE ACTION ...............................................................2

II.     JURISDICTION AND VENUE ..........................................................5

III.    THE PARTIES.....................................................................................5

       A      Plaintiffs ....................................................................................5

       B.     Defendants .................................................................................6

              1. Park West Galleries, Inc. ...................................................6

              2. PWG Florida Inc. ...............................................................7

              3. Vista Art, LLC ...................................................................8

              4. Fine Art Sales, Inc. ............................................................8

              5. Albert Scaglione.................................................................8

              6. DOES I through X ..............................................................9

.IV.    SUBSTANTIVE ALLEGATIONS .....................................................10

       A.     The Art Market:  Background  .................................................10

       B.     Park West:  Background of the Fraudulent Scheme ..................12

              1. Park West's Cruise Line Auctions.....................................13

                     a. Cruise Lines revenue sharing agreements
                        with Park West .........................................................13

                     b. Cruise Lines' promotion and sale of Park
                        West artwork............................................................16

              2. Pre-Auction Events .............................................................19

              3. Park West Auctioneers ........................................................22

              4. Park West's Private Sales ..................................................27

              5. Park West's Land Auctions ................................................27

              6. Park West's contracts for sale – the Invoices .....................29

              7. Scaglione Park West and Fine Art Sales Certificates of Authenticity..33

              8. Scaglione and Park West Appraisals ..................................37

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT -  i
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

C.    The Cruise Lines' Knowledge of the Scheme ...........................................44

1. Litigation with Fine Art Registry.............................................55

2. Litigation with Gary Benfield................................................56

D.    Facts Related to Plaintiffs ........................................................56

1. Plaintiffs Bohm and Lee ....................................................56

2. Plaintiff Sean Mullen ........................................................64

3. Plaintiffs Bruce and Patricia Alleman...................................68

4. Plaintiffs Russell and Melissa Conley .................................72

V.    FRAUDULENT CONCEALMENT; EQUITABLE TOLLING AND
EQUITABLE ESTOPPEL...........................................................................76

VI.    CLASS ACTION ALLEGATIONS ...........................................................78

A.    Class Definition ..........................................................................78

B.    Numerosity..................................................................................79

C.    Commonality................................................................................79

D.    Typicality ....................................................................................81

E.    Adequacy ....................................................................................81

F.    The Prerequisites to Maintaining a Class Action for Injunctive
Relief Are Readily Apparent ........................................................81

G.    Common Questions Predominate, and the Class Action Device
Is Superior ..................................................................................82

VII.    CAUSES OF ACTION ................................................................................82

COUNT I - VIOLATIONS OF 18 U.S.C. §§ 1962(C) AND (D)
(AGAINST ALL DEFENDANTS) ......................................................................82

A.    The Enterprises ............................................................................83

1.    The Gallery Enterprise.......................................................83

2.    Gallery/HAL Enterprise.....................................................86

3.    Gallery/RCCL Enterprise...................................................89

4.    The Gallery/Carnival Enterprise .........................................92

5.    Gallery/Celebrity Enterprise ..............................................95

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

B.   The Defendants' Use of the U.S. Mails and Interstate Wire Facilities..................98

C.   Conduct of the RICO Enterprises' Affairs.........................................104

D.   The Defendants' Pattern of Racketeering Activity ...............................105

E.   Damages Caused by the Defendants' Scheme .....................................106

COUNT II FOR COMPENSATORY AND EXEMPLARY DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF UNDER UNFAIR AND DECEPTIVE TRADE PRACTICES STATUTES OF MICHIGAN AND NEW YORK ...................................107

COUNT III VIOLATION OF MICHIGAN FINE ART STATUTE.........................................109

COUNT IV ADMIRALTY – FEDERAL COMMON LAW FRAUD .....................................110

COUNT V ADMIRALTY – COMMON LAW AIDING AND ABETTING FRAUD.............112

COUNT VI UNJUST ENRICHMENT ....................................................112

COUNT VII AGENCY AND CIVIL CONSPIRACY .................................................113

COUNT VIII DECLARATORY JUDGMENT..........................................................114

COUNT IX INJUNCTION..................................................................115

PRAYER FOR RELIEF ....................................................................115

JURY DEMAND      ....................................................................116

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT -  iii
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1

## <u>INTRODUCTION</u>

2   This Third Amended and Consolidated Complaint ("Complaint") consolidates and

3 amends three actions (the "Michigan Actions")[1] initially filed as separate putative class actions

4 in the Eastern District of Michigan.[2]  The Actions were transferred to this Court as a proper

5 Section 1407 forum by the Judicial Panel on Multidistrict Litigation.  *In re Park West Galleries,*

6 *Inc., Mkting & Sales Litig*., 2009 WL 252576359 (J.P.M.L. August 2009).  The named plaintiff

7 in each of the Actions filed an amended complaint in this Court without class allegations, the

8 class allegations having been centralized in a companion case, *Blackman v. Park West Galleries,*

9 *Inc. Marketing & Sales Litig*,  No. C08-2076 RSL.[3]

10   On June 26, 2010, the Court entered its Orders on motions to dismiss the actions filed by

11 all defendants including dismissal of claims against certain defendants for want of personal

12 jurisdiction in Washington. MDL Dkt. Nos. 199-205**.**  Personal jurisdiction exists over these

13 defendants in Michigan.

14   On July 8, 2010, the Plaintiffs in the Michigan Actions filed a motion to consolidate all of

15 the Michigan Plaintiff Actions into the *Bohm* complaint and to amend the complaint to add class

16 allegations, additional plaintiffs, defendants and a claim for rescission. MDL Dkt. No. 214. On

17 September 15, 2010, the Court granted in part the Michigan Plaintiffs' motion to amend, but

18 denied the Michigan Plaintiffs' request to add a claim for rescission.  The Court also determined

19 that the Hatters, whose Park West Invoices did not contain a contractual statute of limitation

20 clause, should not be consolidated with the other Michigan Plaintiffs, whose Park West Invoices

21

22  [1] *Hatter v. Park West Galleries, Inc*., Civ. No. 12983 (E.D. Mich. filed July 29, 2009) is
being filed as its own separate action per the Court's 9/15/10 Order. MDL Dkt. No. 258.

23  [2] *Bohm v. Park West Galleries, Inc.*, Civ. No. 2:09-cv-11392 (E.D. Mich. Filed April 13,
24 2009), amended complaint filed July 24, 2009; *Alleman v. Park West Galleries, Inc*., Case No.
12896 (E.D. Mich. Filed July 22, 2009; and *Mullen v. Park West Galleries,Inc.*, Civ. No. 12947
25 (E.D. Mich. filed July 24, 2009).

  [3] For *Bohm v. Park West Galleries, Inc.*, the filing in this Court was the Second Amended
26 Complaint.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION   CHIMICLES & TIKELLIS LLP
COMPLAINT - 1                 361 W. Lancaster Avenue
Case No. CV9-1178-RSL             Haverford, PA 19041
                      Telephone: (610) 642-8500
                      Facsimile: (610) 649-3633

1  did contain contractual statute of limitation clauses, because they were not similarly situated.

2  MDL Dkt. No. 258.

3      Accordingly, Plaintiff Joseph Bohm ("Bohm"), individually, and Plaintiffs John Lee

4  ("Lee"), Sean Mullen ("Mullen"), Bruce and Patricia Alleman ("Allemans") and Russell and

5  Melissa Conley ("Conleys"), on behalf of themselves and all others similarly situated, through

6  their undersigned counsel, file this Complaint against Defendants Park West Galleries, Inc. d/b/a

7  Park West Gallery, PWG Florida, Inc., Fine Art Sales, Inc., Vista Fine Art, LLC d/b/a Park West

8  at Sea (together "Park West"), Albert Scaglione and DOES I through X based upon the

9  investigation of their attorneys and upon personal knowledge as to themselves and their own acts

10 and otherwise upon information and belief, as set out below.[4]

11              **I       NATURE OF THE ACTION**

12     1.      This is a putative class action brought by Plaintiffs individually and on behalf of a

13 Class of persons who purchased artwork from Park West, as defined more fully herein.

14     2.      The scheme at issue was orchestrated by Scaglione and Park West with the

15 willing and eager cooperation of the nation's most popular cruise lines:  Royal Caribbean

16 Cruises, Ltd. ("RCCL"), Celebrity Cruises, Inc. ("Celebrity"), Carnival Corp., and Carnival plc

17 d/b/a Carnival Cruises (together "Carnival") and Holland America Line, Inc. and Holland

18 America Line – USA, Inc. (together "HAL") (collectively "Cruise Lines") as members of the

19 Enterprises, described below.  Park West and the Cruise Lines associated for over ten (10) years

20 sharing a common purpose and goal--to funnel passengers to Park West to sell as much Park

21 West art as possible to maximize their own gain at the expense of the Plaintiffs and the Class

22 through operation of the Enterprises (defined below).

23 ───────────────

24     [4]   Consistent with the Court's September 15, 2010 Order, this Third Amended and
    Consolidated Class Action Complaint does not include a claim for rescission of sales contracts or
    the proposed additional allegations regarding Cruise Line control over Park West rejected by the
25 Court.  Otherwise this complaint is substantially similar to the proposed Third Amended and
    Consolidated Class Action Complaint.  Some claims asserted herein are subject to this Court's
26 prior orders on Park West's motions to dismiss.  *See* MDL Dkt. Nos. 199-205.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 2
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

3.      Scaglione and Park West orchestrated a sophisticated and widespread criminal scheme and enterprise that Charles Ponzi would be proud of.  The core element of the scheme is selling art at materially inflated prices.  The scheme targeted individuals who while, unawares, relaxing on their vacations are wined and dined by Park West and Cruise Line employees and are subjected to Defendants' art fraud scheme.  A number of phony devices were used to sell phony and materially overvalued art with worthless Appraisals to unsuspecting victims, including Plaintiffs.  Those devices include**:**

- misrepresenting that the artwork sold by Park West is sold at a price "significantly below market value;"
- misrepresenting the authenticity or provenance of the artwork sold;
- the sale of outright fakes;
- misrepresenting the artwork sold to be "good investments," when the artwork has and can have no investment potential;
- misrepresenting art as lithographs that are not lithographs at all, but rather photomechanical reproductions of original paintings by Dalí signed in his name by someone else;
- sale of art that is falsely claimed to be authored by such artists as Dalí, Picasso and Rembrandt;
- authenticating the artwork with false and deceptive Certificates of Authenticity;
- materially overvaluing the artwork through the sale of phony Appraisals;
- employing high pressure sales tactics at on board auctions; and
- omitting to disclose that the Appraisals are based on no valid methodology.

4.      Plaintiffs and Class members paid materially inflated prices for art pieces purchased from Park West aboard the Cruise Lines that are sometimes little better than poster art and thus, are worth far less than the price paid.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 3
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

5.      The scheme could not be accomplished without the Cruise Lines.  Park West auctions are omnipresent on cruise lines.  Art-at-sea auctions conducted by Park West, or under Park West and Cruise Line control, are regularly featured recreational events offered to passengers on thousands of cruises.  Partnership with the Cruise Lines in the art auction business took Park West from sales of $20 to $22 million in the early 1980s to some $450 million in 2008.  The Cruise Lines had revenue sharing agreements with Park West in which they earned 20-40% of Park West's sales revenue from the shipboard auctions.  Consequently, the Cruise Lines worked together with Park West to aggressively promote the sale of Park West artwork by advertising and hosting Park West shipboard events and functioning as members of the Enterprise.

6.      Park West began operating its scheme by selling materially overvalued artwork at land based auctions and continued to do so until 2009.  But Park West's phenomenal growth and the success of the scheme alleged in this Complaint came primarily from the art auctions at sea.

7.      Park West often used purchases on Cruise Lines to identify potential patrons to be invited and feted at a land auction.  If a customer at a land auction was first identified on a cruise, the relevant Cruise Line received a percentage of the land-based sales or "finder's fee" as if the transaction had taken place at sea.

8.      The impact of this scheme has been extremely costly to Plaintiffs and the Class who were conned into paying significant sums of money for works that are virtually worthless or worth a small fraction of the price charged.  Plaintiffs and Class members have lost thousands of dollars from purchasing "art" at Park West at-sea and land auctions.

9.      As alleged more fully herein, Defendants, as part of the scheme described in this Complaint, made material misrepresentations and omissions regarding the value of the artwork sold and the lack of value or validity of the phony Appraisals sold in order to fraudulently induce Plaintiffs and Class members to enter into contracts (Invoices) to purchase Park West artwork.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 4
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    10.    But for the scheme described and orchestrated by Scaglione and Park West
2  employing Park West's misrepresentations regarding the authenticity, value, and investment
3  potential of the artwork and the Appraisals, Plaintiffs and the Class would not have purchased the
4  artwork.

5    11.    Plaintiffs allege claims for violation of RICO, unjust enrichment, violation of
6  admiralty/federal common law fraud, aiding and abetting fraud, civil conspiracy, declaratory
7  judgment and injunction against Scaglione, Park West and the other Defendants named herein
8  who participated in and otherwise acted in furtherance of the fraud perpetrated on Plaintiffs and
9  the Class.

## II.    JURISDICTION AND VENUE

11    12.    The Judicial Panel on Multidistrict Litigation transferred the Actions to this
12  District from the Eastern District of Michigan.

13    13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1).

14    14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.
15  § 1331 and § 1332, the Class Action Fairness Act of 2005.  The amount in controversy exceeds
16  $5 million, exclusive of interest and costs, and members of the putative Class number in excess
17  of 100 and reside in states different from the Defendants.  This Court has supplemental
18  jurisdiction over the Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367.

## III.    THE PARTIES

**A.    Plaintiffs**

**Individual Plaintiff**

22    15.    Plaintiff Joseph Bohm ("Bohm") is a 74-year-old retiree residing in Glen Oaks,
23  New York.  Bohm is the joint purchaser with Plaintiff John Lee of artwork purchased from Park
24  West at shipboard auctions on a Celebrity cruise to the Caribbean in 2002 and a Carnival cruise
25  to the Caribbean onboard the *Victory* in September 2004.  Because of reasons of ill health, Bohm
26  is unable to represent a Class.  Bohm proceeds on his claim individually.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 5
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

**Named Plaintiffs**

16.     Plaintiff John Lee ("Lee") is a retiree, residing in New York, New York.  Lee is a joint purchaser with Bohm of artwork purchased from Park West at shipboard auctions on a Celebrity cruise to the Caribbean in 2002 and a Carnival cruise to the Caribbean onboard the *Victory* in September 2004.

17.     Plaintiff Sean Mullen ("Mullen") is a citizen and resident of Washington, District of Columbia. Mullen Purchased artwork from Park West in December 2003 onboard the Royal Caribbean cruise ship *Serenade* and in May 2005 onboard the Holland America cruise ship *Zuiderdam*.

18.     Plaintiffs Bruce Alleman and Patricia Alleman (the "Allemans"), husband and wife, are citizens and residents of Waukegan, Illinois. The Allemans purchased artwork in December 2005 at a Park West shipboard auction onboard the Royal Caribbean cruise ship *Enchantment of the Seas*.

19.     Plaintiffs Russell and Melissa Conley (the "Conleys"), husband and wife, are citizens and residents of Newburgh, New York. The Conleys purchased artwork in February 2007 at a Park West shipboard auction onboard the Carnival cruise ship *Sensation*.

20.     The Individual Plaintiff and the Named Plaintiffs are referred to collectively as "Plaintiffs."

**B.     Defendants**

**1.     Park West Galleries, Inc.**

21.     Defendant Park West Galleries, Inc. d/b/a Park West Gallery ("PWG") is a corporation organized under the laws of Michigan with its principal place of business and headquarters at 29469 Northwestern, Southfield, Michigan 49034.

22.     PWG, on its Park West Gallery website, bills itself as the largest single operator of art auctions in the United States.  PWG sells approximately 300,000 pieces annually with

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 6
Case No. CV9-1178-RSL

$300 million in annual sales.  One-half of PWG's auction sales occur at shipboard auctions conducted during leisure cruises on the Cruise Lines departing from the United States.  PWG had an exclusive contract to conduct art auctions on the Cruise Lines.

23.     PWG has approximately 180 employees at its Southfield, Michigan headquarters where it operates exhibition galleries, executive offices, maintains staff functions, framing department and customer service department, art storage facilities and conducts research from that location.  PWG prepares and distributes the phony Appraisals that are sold to successful bidders like Plaintiffs and the Class at the shipboard auctions.  These Appraisals are paid for separately from the price of the artwork and, like the artwork, can be paid for by a purchaser by adding the price of the artwork or Appraisal to the ship's bill or separately by credit card.

24.     PWG is not a publicly held corporation.  Complete information about the corporate structure of PWG, including the nature of its affiliations with other Park West related or non-related entities, is not available to Plaintiffs and is under the exclusive control of Scaglione and Park West.

25.     Defendant Albert Scaglione (see below) owns the controlling interest in PWG and is its CEO.

**2.    PWG Florida Inc.**

26.     Defendant PWG Florida, Inc. ("PWG FL") is an affiliate of PWG, incorporated in Delaware with its principal place of business in Miami Lakes, Florida.  Much of the artwork sold at sea by PWG is delivered from the PWG FL warehouse in Miami Lakes, Fl.

27.     PWG FL has or had approximately 207 employees in Florida.  PWG FL's function is to distribute the art work sold at the Park West shipboard auctions.  PWG employees travel frequently to PWG FL to conduct Park West's business and PWG FL employees travel to

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 7
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    Michigan to conduct PWG FL business.  Park West auctioneers are also frequently trained at the

2    PWG FL location.  Scaglione travels frequently to Florida to conduct PWG's business.

3    28.    There are financial and contractual relationships between PWG and PWG FL that

4    have been in place and functioning for at least ten years.

5    29.    Scaglione owns the controlling interest in PWG FL.

6

7    **3.    Vista Art, LLC**

8    30.    Defendant Vista Art, LLC ("Vista") is a Delaware limited liability company with

9    its principal place of business located in Southfield, Michigan at the same address as PWG.

10   31.    Vista does business as Park West at Sea ("PWS") selling artwork at auctions on

11   the Cruise Lines and has done so for at least ten years.

12   32.    Scaglione owns the controlling interest in Vista as its sole member.

13   **4.    Fine Art Sales, Inc.**

14   33.    Defendant Fine Art Sales, Inc. ("FASI") is a Delaware corporation with offices in

15   Southfield, Michigan in the same facility as PWG.  FASI sells or sold artwork aboard ships of

16   Celebrity and Carnival.  FASI was acquired by PWG in or around 1999.  FASI is closely

17   affiliated with Park West Galleries, Inc., as the two companies share the same street address and

18   have officers and directors in common.  The principals of Fine Art Sales are Albert R. Molina,

19   Jr., a partner and business associate of Albert Scaglione, in PWG; Marc Scaglione, Albert

20   Scaglione's son, and Nicolette J. Yanke, Albert Scaglione's stepdaughter.

21   34.    Scaglione owns a controlling interest in FASI.

22   **5.    Albert Scaglione**

23   35.    Albert Scaglione ("Scaglione") is a citizen and resident of Michigan.   Scaglione

24   is the prime architect of the fraud and conspiracy described in this Complaint.  Scaglione is the

25   founder, president and chief executive officer of PWG, having held the position of CEO for forty

26   (40) years.  Scaglione is in charge of the day-to-day operations of Park West and each of the

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 8
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1   Park West entities described above and personally earned millions of dollars from the sale of

2   artwork and Appraisals at shipboard auctions on the Cruise Lines.

3        36.    Albert Scaglione signs most of the Certificates of Authenticity and Appraisals for

4   Park West sales, others are signed by Gallery Director, Morris Shapiro.  In those instances where

5   Scaglione did not sign the Certificates of Authenticity or Appraisals, they were signed at

6   Scaglione's and Park West's direction and control, such as those Certificates of Authenticity

7   signed by Morris Shapiro or FASI Principal Albert Molina.

8        37.    Scaglione is responsible for establishing policy and practices for Park West and is

9   the advisor and decision maker for the other Park West entities and is responsible for

10  coordinating all their activities.  All of the Park West entities are involved in the cruise line and

11  land sale auctions of Park West artwork.  Scaglione personally was involved in negotiating Park

12  West's contracts with the cruise lines and Plymouth Auctioneering (identified below) and also

13  was consulted regarding the compensation for Plymouth's auctioneers

14       **6.    DOES I through X**

15       38.    At all times relevant hereto, Defendants DOES I through X, were and now are

16  corporations, firms, partnerships, associations or other legal entities or individuals who

17  committed the acts alleged herein, and acted within the scope of their agency, with the consent,

18  permission, authorization and knowledge of the others, and in furtherance of both their interests

19  and the interests of Defendants they aided and abetted, and with whom they conspired, as set

20  forth below; that the true names, identities or capacities whether individual, corporate, associate

21  or otherwise of the Defendants DOES I through X, inclusive are presently unknown to Plaintiffs,

22  whom therefore sue said defendants by such fictitious names; that the Plaintiffs are informed and

23  do believe and thereupon allege that each of the Defendants sued herein as DOES I through X

24  are responsible in some manner for the events and happenings herein referred to, which thereby

25  proximately caused the injuries and damages to the Plaintiffs alleged herein; that when their true

26  names and capacities of such Defendants become known, Plaintiffs will ask leave of this Court to

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 9
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    amend this Complaint to insert the true names, identities and capacities, together with proper

2    charges and allegations.

3        39.    Park West, PWF FL, Vista, FASI, Scaglione and DOES I through X are referred

4    to together as "Defendants."

5

6                    **IV.    SUBSTANTIVE ALLEGATIONS**

7    **A.  The Art Market:  Background**

8        40.    The term "art multiple" or "multiple" means any "fine print."  The word "fine" is

9    simply an adjective that can be applied to any form of printing involving any process or

10   combination of processes, commercial or otherwise.  The term "fine print" means any multiple

11   produced by, but not limited to, an engraving, etching, woodcut, lithograph, serigraph, and

12   photographic negatives, or any combination thereof.  The term "fine print" does not include

13   photomagnetic or computer generated photocopies.

14       41.    "Original print" is a photograph, or similar art object produced (replicated more

15   than once) in more than one copy.  The processes listed in themselves do not guarantee

16   originality.  It is the artist's intent to work in a given process or medium or combination of

17   processes that gives the work originality.

18       42.    The term "lithograph" has more than one meaning.  It can mean the artist draws

19   the image on a treated zinc plate or prepared stone.  The finished drawing on the surface of the

20   plate or stone is treated with gum Arabic and nitric acid then moistened with water.  This

21   establishes a resist situation contrasting the "open" or undrawn areas of the surface with areas

22   making up the image.  The treated surface draws water to the "open" areas but rejects the water

23   where the artist has drawn.  While the treated stone or zinc surface is still wet from the water, ink

24   is rolled over the surface.  The ink is attracted to the drawn areas but repelled by the water held

25   by the "open" areas of the surface.  Next, appropriate paper is placed on the inked surface and

26   run through a press to apply significant pressure to the back side of the sheet to effect transfer of

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 10
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

the image held by the inked surface.  The artist prepares a separate stone or plate for each color which is to appear in the finished image.

43.     A "lithograph" can also describe a photomechanical offset print.  A mechanical offset print is simply a photomechanical reproduction where the artist has no involvement in the printmaking process other than possibly adding a signature and a number.  This commercial printing process is also known as "offset lithography."  The value for an offset lithograph is significantly less than that created by a hand-printed zinc plate or stone unless the artist intended from the outset to make an offset lithograph.

44.     The term "serigraph" is another word for silkscreen.  It represents an attempt by the Western Serigraph Institute and others to establish a term to distinguish fine art silkscreen printing from commercial silkscreen printing.  A "serigraph" means a color print made by silk-screening the image onto paper (most common surface), plexiglass, metal or some other surface.  For prints in this medium, the artist's direct involvement is not guaranteed or necessarily implied.  The printing of Andy Warhol's serigraphs would be a good example of where the artist's direct involvement with each impression printed is very limited.

45.     The value of an art multiple depends on more than its authorship.  For example, the value of an original lithograph also depends on the number of impressions produced, whether it is one of a very few or a larger printing or whether the original plates, stones or surface will be destroyed after a fixed number of impressions are pulled by the artist.  The hand-signing by the artist guarantees that the artist has examined each of the printed works and verifies that the number of impressions printed is correct.

46.     The edition numbers are intended to reassure the purchaser of the limited nature of the printing.  The total number printed per edition is important in determining value.  Typically, editions of over 500 impressions of a given image mean the print has less value.  On the other hand, an edition of 50 or fewer prints of a given image would generally be considered significantly more valuable.  Also, the method of numbering is critical.  For example, if there are

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 11
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

multiple editions (*i.e.*, 250 in each) of a given image, the total number of impressions of that subject that exist, including the number of artist's proofs should be indicated.  Hors Commerce impressions, Roman Numeral impressions and various Arabic numbered impressions must be considered in aggregate to determine an accurate value for each impression of that subject.  A change of papers used in the printing (Japon paper for a "preferred" edition and Arches or Rives for the regular edition) is often used to justify the need for more than one printing of the image and a higher price charged.  This practice often does not acknowledge the fact that all of the impressions are pulled from the same surface(s) prepared by the artist.

47.     Whether a print is an "original" or a "reproduction" depends on several factors.  "Original" prints turn on whether the print created and the process or processes employed represent the artist's original intent to create that image.  "Reproductions" are prints created to reproduce an existing painting, watercolor, drawing, original print, or other work of art.  They replicate existing work using a process different from the artist's original process used to make the image.  Reproductions are often considered simply "fancy photocopies."  Many art dealers, like Toronto art dealer Donald Robinson, consider the "signed-reproduction market a ruse … and the problem is convincing the uninformed art buyer that these are not original prints."  "At prices often exceeding $1,000 per print, it is an expensive ruse."  Natzmer, Skip, "Art Prints:  The Michigan Art Multiples Sales Act," 83 MI Bar Jnl. 30 (February 2004).

48.     The authenticity of an artist's signature requires that the artist be alive and actually sign each impression himself or herself.  For example, if Picasso's daughter signed his lithographs with a signature resembling Picasso's after his death, this information is critical in determining authenticity and establishing value.

### B.     Park West:  Background of the Fraudulent Scheme

49.     Park West, on its website, bills itself as the world's largest art dealer.  As of March 2009, Park West sold more than 300,000 pieces annually with approximately $450 million in annual revenue.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 12
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

50.     Park West's website continues to represent on its website that:

> Park West® has NEVER sold a work of art that is not authentic in it's nearly 40 year history! You can be assured that each and every work of art Park West® sells has been reviewed and researched by our extensive network of definitive experts and art scholars. The Park West® Certificate of Authenticity GUARANTEES the artwork is absolutely genuine."

http://www.parkwestgallery.com/tour/faqs.aspx (last visited September 22, 2010).

51.     In 2008, Park West employed 180 people at its Southfield, Michigan headquarters (now reduced in size due to the economy) where Park West operates exhibition galleries, maintains its executive offices, develops and directs staff functions, trains auctioneers, maintains art storage and research facilities, and maintains its framing and customer service departments. PWG also maintains its business records at the Southfield, Michigan headquarters.

52.     The fraudulent techniques used by Park West are the same whether on cruise line auctions or land auctions.

### 1.     Park West's Cruise Line Auctions

#### a.     Cruise Lines' revenue sharing agreements with Park West

53.     A cruise ship is essentially a floating mall.  The financial success of a voyage for a cruise line depends – not on the number of state rooms sold – but on revenue from vendor/concessionaires sales like Park West.  In cruise markets characterized by deep discounting for tickets, revenue from concessionaires is more important to Cruise Line profitability than revenue from ticket sales.

54.     The launch of Park West's ocean-going venture overlaps the explosion in popularity of leisure cruises as a vacation choice for Americans.  Park West was able to sell the Cruise Lines on shipboard art auctions as money-making "events" by relying on its on-land track record.  By the time Park West launched its shipboard art auction venture, Park West had already established its on-land venture as a leader in "popular art" auctions.

55.     At times relevant to the Complaint, Park West controlled a majority of the shipboard art auction business on Cruise Lines departing from the United States.  Park West had

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 13
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

an exclusive contractual right to conduct art auctions on all voyages on all ships for the Cruise
Lines and has conducted such auctions pursuant to the contractual arrangement for over ten
years.  Although Scaglione and Park West launched their shipboard auctions over fifteen years
ago, Park West only entered into an exclusive agreement for all ships on the line with contracts
(concession agreements) to conduct shipboard auctions aboard Royal Caribbean and Celebrity
Cruises in 1993.  With the acquisition by Scaglione of Defendant Fine Art Sales, Inc. in or
around 1999, Scaglione and Park West acquired exclusive concession agreements on other cruise
lines, including Carnival and Holland America.

56.     Over 17 million passengers cruise annually.  In the 10-year time period since Park
West began its exclusivity period in shipboard art auctions, the leisure cruise industry has
become the fastest growing segment of the American travel and leisure industry, raking in
revenues of $30 billion in 2008.  The demographics of cruise ship passengers who attend Park
West's art auctions consist of well-educated, affluent, middle-to-older aged vacationers with
time to spare and money to spend.  The Caribbean is the number one destination from the U.S.
for leisure cruises.

57.     █████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 14
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

58.     The Scaglione/Park West/Cruise Lines relationship provided a new and significant source of revenue for Scaglione, Park West and the Cruise Lines.  The Cruise Lines intended to and did benefit from the fraudulent sales by Park West artwork onboard their ships.

(a)     One-half of Park West's sales occur at shipboard auctions conducted during leisure cruises on the Cruise Lines.  Cruise Line auctions account for up to 80% of company revenue.

(b)     ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

(c)     In 2008, Royal Caribbean (Celebrity's parent company) had revenues of approximately $1.4 billion, with 27% of that revenue coming from onboard "revenue accounts" of vendors or concessionaires like Park West.

(d)     David Stanley, Vice president of Shipboard Revenue for Royal Caribbean stated in an interview in 2008, that Park West art auctions are a way of getting "cultural enrichment" for their passengers.  On the 15 ships of Royal Caribbean, approximately 22, 500 works of art are sold a year.  Prices start as low as $100 and reach thousands or tens of thousands.

59.     Neither Park West nor the Cruise Lines disclosed to Plaintiffs and the Class that the Cruise Lines had a material financial interest in the auction sales.

60.     According to the declaration of Albert Molina, a principal of FASI, filed in *Park West Galleries, Inc. v. Fine Arts Registry, et al.*, (Dkt. No. 27-3) Case No. 2:08-cv-12247 (E.D. Mich. Mar. 20, 2009), Park West's contractual agreements with the cruise lines are valuable, proprietary information concerning the financial relationship between Park West and the cruise lines and a closely-guarded secret.  Park West and the Cruise Lines share the common goal of making money from the art auctions.  Park West and the Cruise Lines each play their part in conducting and operating the fraudulent scheme.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 15
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

61.     The financial success of the shipboard auctions depends heavily on the trust and confidence placed in the Cruise Lines by Plaintiffs and the Class in selecting the Cruise Line as a carrier.  Park West trades on cruisers' trust and faith in the Cruise Line to sell the artwork. Repeat business by cruisers is critical to the success of the Cruise Lines.  In 2008, one-half of all passengers on cruise ships were repeat cruisers.  Repeat cruisers would be familiar with Park West, having seen them while onboard a previous cruise and having heard the same pitch on all cruises.

62.     With such a significant amount of revenue and reputation at stake, the cruise lines are quick to act to quell any objection to the sale of Park West artwork aboard their ships.  For example, in July 2009, a Royal Caribbean passenger was forcibly removed from the cruise ship and left at the Oslo, Norway port, requiring him to make his way to England to meet up with the rest of his family still aboard the ship.  On this 12-day cruise, there were three (3) Park West auctions.  While aboard the cruise, the passenger researched on-line information about Park West auctions, fraud protection, and the pending lawsuits against Park West.  He distributed a "fact sheet" to other passengers.  The ship's Hotel Director Rodney Darwin and the Staff Captain Aladin Hafex quickly summoned him and asked him to be removed from the ship.  Neither the ship's Hotel Director nor the Staff Captain could articulate a reason for justifying the passenger's removal.  Ship security asked the passenger to voluntarily leave the ship.  When the passenger refused, Oslo police were brought aboard to remove him from the ship at the request of the ship's captain.

### b.     Cruise Lines' promotion and sale of Park West artwork

63.     The Cruise Lines market and promote Park West at-sea auctions and the sale of Park West artwork.  For example, Carnival publishes and circulates a daily newsletter with events, called "Carnival Capers."  Park West has prominent advertisements in these newsletters, such as:

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 16
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



**PARK WEST®**

**GRAND FINALE ART AUCTION**

Going once… Going twice… Sold!
FREE champagne, FREE artwork, FREE entry into the massive
art raffle, $500 Bid Credit given away!  This is your last chance
to collect art this cruise up to 40% off gallery prices. We saved
some of the best for last!  New artwork and mysteries you will
not want to miss out on!

1:00pm Preview with auction to follow..........................El Morocco, Deck 5



**PARK WEST®**

**DESTINO**

Join your art team in the Boardroom for a screening of
Destino - a spectacular collaboration between Disney and
Salvador Dali.
It will be a surreal experience....
1:00 pm …………… Boardroom, Deck 4 aft

**KINKADE & SPORTS MEMORABILIA MANIA**
The Painter of Light VS Ali, Pete Rose,
and Brett Favre!
Join us at this one time only event.

**3:00PM - 5:00PM…….. THE ART ROOM**



**PARK WEST®**

**MODERN MASTERS EXHIBITION**

Join the Art Department in the Gallery for an evening of Modern
Masters: Agam, Britto, Tarkay, Bellet, Gockel & LeKinff.
This is your chance to preview some of the works we'll be
bringing up to the auction block at the Grand Finale Art Auction.

7:00pm - 10:00pm............Art Room, Deck 3
(Just outside the Black Pearl Dining Room)



**PARK WEST®**

**GUESS THE PRICE OF THE MAX**

Stop by the Art Gallery and submit your guess on an original
Peter Max.
Winner announced during the Grand Finale Auction.
Closest guess wins a suite of art.

7:00pm – 10:00pm Guess the Price of the Max
Art Room, Deck 3
(Just outside the Black Pearl Dining Room)

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 17
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1

2

3

4

5

6

7

8

9



10      64.     In case passengers did not see the Park West advertisements in the daily

11  newsletter, Carnival also includes large colored brochures advertising Park West's on-board

12  auctions tucked inside the Carnival Capers newsletter.  Examples of these brochures include:

13

14

15

16

17

18

19      

20

21

22

23

24

25

26



65.     Additionally, during a cruise, televisions in passenger rooms have Carnival themed programs describing events, things to do, and highlights of previous events.  Park West advertised on these programs.  For example, one advertisement features Morris Shapiro, the Park West Gallery Director, describing the general nature of Park West's business.

66.     The Cruise Director on each voyage selects the location and timing of the auction, advertises the auction in the ships' daily itineraries, passes out daily flyers advertising the auctions and any promotions, encourages passengers to attend and enjoy champagne cocktails in the party-like shipboard atmosphere, and limits competing entertainment at the time of the auction.

**2.     Pre-Auction Events**

67.     Park West in conjunction with the Cruise Lines hosts free unlimited champagne events prior to auctions.  The unlimited champagne is served to potential buyers by the cruise ship crews.  These meet-and-greet events generally last an hour and allow for pre-bidding.  Pre-

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 19
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1   bidding essentially means that a cruiser can flag a particular piece of art with a post it and when

2   the piece was brought up to the block, the bidding supposedly began at a "reduced" starting bid.

3   Champagne flows freely during the meet-and-greet and prospective bidders register for a bid

4   number for the auction.  For example, the following Park West marketing materials can be found

5   on a Carnival cruise:



6
7
8
9
10
11
12
13
14
15
16
17

18          68.     The auctioneers circulate among the passengers speaking to prospective bidders,

19   informally laying the foundation for the uniform sales pitch used at Park West auctions:  (1) the

20   auctioneers have expertise in art, which not all do; (2) the artwork to be offered at auction is a

21   "good investment," which it is not; (3) the artwork is "original," which it is not; (4) the artwork

22   actually received will be a "unique variation" (not a copy) of the artwork displayed; (5) any

23   artwork purchased at auction "will appraise immediately on shore for many times the auction

24   purchase price," which is not true; and (6) the price paid for the artwork is "significantly below

25
26

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 20
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

market value," which also is not true.  All of these representations are made within earshot of the Cruise Line crews and under the supervision (for the crew) of the Cruise Director.

69.     Participants in the Park West auctions are given a bid number or card ("bid cards") that contains preprinted pre-purchase terms and conditions double sided in small print. These terms and conditions in fine print include a broad list of exclusions regarding the Appraisals and Certificates of Authenticity and included, prior to 2008, a statement under the bolded heading "Please Read Carefully All Terms and Conditions Before Buying."   As the first condition of sale the bid card states "**ALL SALES ARE FINAL.**"  More free champagne is poured for all who request a bid card.  The meet-and-greet is a party with the Passenger a guest and the Auctioneer the friendly host.

70.     The atmosphere is deliberately not conducive to carefully reading the bid-card before bidding.  But, "ALL SALES ARE FINAL" is stated clearly.

71.     Since 2008, the terms and conditions contain a 5-year guarantee of coverage for authenticity, and a since discontinued limited 40-day return policy, 40-month exchange policy, a disclaimer and limitations on remedies.  The disclaimer and limited remedy specifically broadly excuses Park West Gallery and "the cruise line" from liability:

> **6)  DISCLAIMER and LIMITED REMEDY.  In no event shall Park West®, Park West Gallery®, the cruise line, or any of their respective parents, affiliates, subsidiaries, officers, directors or employees be liable for any damages whatsoever, including but not limited to incidental or consequential damages, loss of profits or loss of value or increase in value. We disclaim any liability for: (i) insurance losses, or (ii) claims for refunds or money damages based on a claim that our appraised value is too high, too low, or otherwise inaccurate in any respect. It is further specifically understood that the sole remedy available is the rescission of the sale and refund to the original purchaser of the original purchase price paid for the item(s) as the sole and exclusive remedy and is in lieu of any and all other remedies which might otherwise be available. ANY AND ALL CLAIMS OR DISPUTES ARE SUBJECT TO AND GOVERNED BY THE ARBITRATION PROVISION SET FORTH IN THE AUCTION INVOICE.**

A copy of a typical bid card is attached to this Complaint as Exh. A.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 21
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

72.     Participants may also receive a number of raffle tickets that would be drawn between auctioning pieces of art.



Raffle prizes may include jewelry, pieces of art, T-shirts and tote bags.

### 3.     Park West Auctioneers

73.     During the auctions, Cruise Line employees wear Park West polo shirts, but with name tags identifying the cruise line. Crews from the Cruise Line set up (carry the art out to the easels), clean up (take the art back to storage), and serve passengers champagne paid for by Park West at the venues. Cruise Line employees even prepare the paperwork after the sale if Park West has not assigned assistants to the auctioneers for the cruise. Auctioneers circulate frequently wearing name tags identifying themselves as crew members.

74.     Park West auctioneers preside over both cruise ship and land-based art auctions. Park West auctioneers are paid a percentage of the sales revenue generated per voyage or venue and receive an increased commission rate for generating higher sales.

75.     Increased sales are also an incentive for auctioneers to be "promoted" to better cruise ships (*i.e*., Royal Caribbean or other cruise ships catering to more affluent passengers) or land venues. Auctioneers are required to pay their own room and board (stateroom and meals) while onboard the ship, but are given passenger access and are free to roam and mingle among the Cruise Line passengers.

76.     Park West recruits, trains and controls the auctioneers. In recruiting auctioneers, Park West uses Plymouth Auctioneering Services, Ltd. ("Plymouth"), a company located in

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 22
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

Turks and Caicos.  Plymouth provides independent services of recruiting art auctioneers for art dealers, like Park West, but per Plymouth's website, www.plymouthauctioneering.com, its recruiting is directed solely to recruiting auctioneers for Park West cruise auctions.

77.     Park West, not Plymouth manages, trains, directs and controls the auctioneers for work on cruise line cruises.  Auctioneers are trained in Michigan at Park West headquarters by Park West personnel and during the Class Period (see below) have been trained at the Miami Lakes location of PWG FL.  Per contract, Park West and Scaglione are consulted regarding the compensation for Plymouth's auctioneers and can remove auctioneers from Plymouth.

78.     Park West employs a training staff consisting of the following individuals: (1) Stoney Goldstein, Executive Vice President of Sales for Park West; (2) Morris Shapiro, Gallery Director; (3) Lane Conner, Fleet Manager, Park West Gallery; and (4) Paul Bielby, National Sales Manager, Plymouth Auctioneering.[5]  Albert and Marc Scaglione also make appearances and give speeches at auctioneer training.

79.     Park West provides potential auctioneers with information about the artists and artwork it sells and requires the trainees to know this material before the trainee gets to his or her assigned training facility.

80.     According to a former auctioneer, the potential auctioneers then spend the majority of their time at training learning about enhanced sales techniques[6] and how to identify potential "marks."[7]

---

[5] Plymouth Auctioneering website:  http://www.plymouthauctioneering.com/the-trainers.aspx (last visited September 22, 2010).

[6] Auctioneers are taught by Park West to use the "give away-take away" technique, whereby the auctioneer puts a piece of art in a passenger's hands and tells them a "story" about the piece. Once the potential buyer begins to identify with the piece, the auctioneer "takes it away" by putting it back on the easel.  The "story" is an important aspect of making the sale because buyers often take that story home with them to repeat to friends and family who view the artwork in the buyer's home.

[7] Auctioneers identify "marks" by observing the behavior of Cruise Line passengers and by "chatting up" passengers at dinner.  For example, an auctioneer can spot a "mark" if a passenger tends to linger in front of a particular piece of artwork.  Park West also teaches its auctioneers

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 23
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

81.     Most of the auctioneers recruited and trained by Park West have little or no formal art education when hired and may not have licenses from any state.  In fact, knowledge or education in art is not a required job qualification for future auctioneers.

82.     After training, former auctioneer Jim Schlosser was sent on his first Carnival cruise by Park West.  On that cruise, he "was taught how to sell high dollar framing, how to run the bid levels to ridiculously high levels and then tell the audience that the bid was actually worth that much," but at the same time say he was selling them at a much lower price than what was bid, and how to call out phony bid numbers to make it look like others are interested in the "bargain."

83.     Auctioneers are provided with the Park West Appraisal value for each of the pieces it sells at auction.  The sales pitch employed by the auctioneers at every auction touts the investment value of the artwork including sales patter fixing the value of each piece at the dollar amount developed by Park West in Michigan prior to the auction.  This "value" is then used by Park West as the Appraisal value, which Park West will offer or sell along with the art. The script Park West employs to instruct its auctioneers to use at land and shipboard auctions teaches auctioneers to misrepresent that the artwork is authentic, valuable, a "good investment" and that it will "appraise immediately after purchase for many times the sale price."  Similarly, Park West training materials direct auctioneers to use the following selling phrases to get the bid: (a) "In a couple of years you'll thank me for bringing this to you;" (b) "You are getting a lot for your money here;" (c) "You'll never get more value for your dollar;" (d) "Why watch everyone else get the bargains;" (e) "It's not what you spend it's what you save;" (f) "Any day, every day

---

that passengers who actually bid at the auction are more willing to spend money.  The auctioneers will then attempt to "upsell" these bidders at the individual appointments all winning bidders must schedule to "finalize" their purchase.  "Park West Contracted Auctioneers Speak Out: Article #7," Fine Art Advocacy, http://www.fineartadvocacy.com/articles/2009/06/art-auctioneers-contracted-through-park-west-gallery-speak-out-7.php (last visited Jan. 14, 2010).

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

it will prove its worth;" (g) "This is a marvelous buy;" (h) "This is significantly below market value;" (i) "This is your opportunity to acquire an original …;" and (j) "A piece of history is on the block right now."

84. When Mr. Schlosser was sent on a Crystal Harmony cruise, during the auctions, he had a special program on his laptop that listed every piece of art, a description of the art, a Park West appraisal, financial information if he sold the piece including the commission he would make, and other background information to make it appear that he was an expert on the piece. He was also taught by Park West to use a list of phony bid numbers in order to spark interest in the art. His assistant, his wife, would enter the bid information once a piece was sold into her computer and print out an invoice for the bidder. At that time, Park West sales were charged to the passenger's ship account and the ship's accountant would enter the sale on the passenger's bills, or the passenger could open a Park West Collectors Card while onboard the ship.

85. Park West auctioneers sometimes requested passenger participation in their effort to falsely inflate the bid price. A passenger explained how:

> Janet and I attended one cruise auction to watch the Carnival barker act, a wonderful exercise in Machiavellianism. But we were taken aback when we were asked by an auction employee to help them 'start the bidding,' stating that we would be given free art in consideration for our help in driving-up prices.

Burleson, Donald K., "Cruise ship Art Auctions – Scams, Fraud or bargains?" *The Discriminating Explorer* (2009 Updates), http://www.dba-oracle.com/t_cruise_art_auctions_scam_fraud.htm (last visited September 22, 2010).

86. Mr. Schlosser also auctioned "sacrifice art," which he was trained to use to "shock and stimulate the audience." He described the "sacrifice art" as "over-appraised junk abstract art." He discussed its "value and importance and ask for a bid and when the first person raised a card say 'SOLD.'"

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 25
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

87.     Auctioneers' selling techniques taught by Park West emphasize the relationship between Park West and the Cruise Lines typically stating, *e.g*., "Do you think [the Cruise Line] would allow us to have a shop here if we were fraudulent?  If we were not reputable?"  Park West's presence on the Cruise Lines lends legitimacy and credibility to Park West and Park West, with the Cruise Line's permission piggy backs on the Cruise Lines' reputation.

88.     Different works or "lots" of artwork are presented for sale each day at each auction as the cruise progresses.  This procedure assures that Park West has new works to auction each night, replenishing its supply of artwork and also encouraging repeat business from passengers who might otherwise not attend another auction.  Crew members load up the new art to be offered for each auction and remove art that is sold.  Frequently artwork purchased was not even off-loaded from the boat in order to be sent to Michigan or Florida for framing because Park West already had an identical piece in the warehouse.  Park West (until 2010) never disclosed that the bidder might receive a substantially similar piece (as determined by Park West) but not the piece bid on at the auction.

89.     Passengers have complained about Park West's auctioneers' questionable tactics.  For instance, a Carnival passenger complained to the Florida Attorney General's Office that the Park West auctioneer was artificially inflating the price of the artwork by calling out bid prices even though no one was bidding.  After the passenger purchased artwork, she was told that the artwork she bought was not actually the piece she would receive and she was not given information on what artwork they actually purchased.

90.     The Park West auctions begin in the party-like atmosphere of the cruise ship, with the auctioneer masquerading in the guise of a friend (sometimes dining with passengers on the cusp to encourage bidding) but once the auction begins, high pressure sales techniques are used to close the sale.  Auctioneers are encouraged in their Park West training to embarrass or belittle bidders who hesitate.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 26
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

4.      **Park West's Private Sales**

91.     As bidding is closing down, the auctioneer encourages bidders to attend a "private sale" where the unsold artwork is displayed and available for purchase, and where the auctioneer can apply additional one-on-one pressure to attempt to "upsell" the potential buyer.  The cruise lines provide the venue for the private sale at sea.

92.     As part of their uniform sales pitch, auctioneers add to the misrepresentations detailed above by stating that the artwork for sale at the private sale is *an even better value* than the artwork at auction because there are no other bidders at the private sale to drive up the price.  Purchasers at the private sale pay the buyer's premium as if the artwork had been purchased at the auction.

93.     The Cruise Lines further participate in the illegal scheme by allowing cruisers to pay for their Park West purchases and the Park West phony Appraisals on the ship bill (which each ship renders to passengers immediately prior to disembarking).  Ship bills are typically paid by credit card using transfers between corresponding banks.

94.     The artwork sold by Park West (that cannot be carried off a cruise ship) is generally delivered to the buyer at his/her home address *via* Federal Express approximately six weeks after purchase.  A Certificate of Authenticity is placed inside the box at delivery.  The promise of the Certificate of Authenticity is touted at the auctions by the Park West auctioneers and is yet another hook for Park West.  The Appraisal arrives separately at the passenger's home, usually later *via* U.S. Mail.

5.      **Park West's Land Auctions**

95.     Park West advertised its land auctions on television and *via* direct mail.  Land based auctions were held around the country at larger hotels like Radissons.  Frequently Park West directly targeted former cruise customers who already purchased art at a Park West auction for a land auction near their home.  These customers, which include Plaintiffs, were invited by direct mail or phone call and invited to attend the auction.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 27
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

96.     The land based auctions could be one day or multiday events that were operated following the identical patterns and practices as the Park West auctions at sea.  The actual auction was preceded by a meet-and-greet where customers were treated to dinner at the hotel and given a chance to drink, mingle and preview the art.  The meet-and-greet could last a whole day.  Favored customers were treated to dinner at the hotel that night.

97.     Just as on board ship, immediately before the actual auction, customers were given the opportunity to circulate and view the art to be sold and to tag any item that they might be interested in purchasing.  The customer then waited for it to be placed on the block and for bidding to begin.  Dinner and drinks for all customers were provided on auction day.

98.     Special event auctions, held at glamorous locations such as Las Vegas were also conducted by Park West.  Customers who attended these land auctions, like Christopher and Martha Davidson ("the Davidsons"), plaintiffs in the related *Blackman* action, and Charles Intha, also a plaintiff in *Blackman*, were more likely to be specifically invited by Park West.  Some, like the Davidsons, were flown to the location at Park West's expense and put up in the hotel for 3 to 5 days.  The "all expense paid trip" to Las Vegas was one of the draws for the special event auctions.  Additionally, a Park West captive artist was also present at least, at the meet-and-greet, to mingle with the guests.  Linda Le Kniff attended the Las Vega auction where the Davidsons were guests of Park West.

99.     Park West covered all of the expenses for the hotel and meals and even entertainment.  For example, the Davidsons, were treated to Cirque de Soleil, with Morris Shapiro, the Park West Gallery Director also in attendance.  Back at the hotel of the auction venue, during the time of the actual auctioning, a bar was set up outside the room where guests could have unlimited drinks.

100.    Purchasers at the land based auctions received Invoices identical to the Invoices given to cruise ship customers (minus the name of the ship), and Certificates of Authenticity and

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 28
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1   Appraisals identical in form to those for shipboard customers.  The artwork auctioned is the same

2   low quality overpriced art auctioned onboard ship.

3         **6.**      **Park West's contracts for sale – the Invoices**

4       101.    Plaintiffs are not sophisticated purchasers of art. Plaintiffs and the Class were

5   induced by Park West's misrepresentations regarding the investment value of artwork to enter

6   the sales contracts. Plaintiffs and the Class reasonably believed that Park West had special skill

7   and judgment regarding the value, investment potential and authenticity of artwork based on

8   Park West's uniform representations. Park West's Invoices also reflect Appraisals purchased by

9   Plaintiffs and the class that were designed by Scaglione and Park West to further support Park

10  West's special skill and judgment regarding the value of the artwork. Additionally, written

11  representations and statements made by Park West employees that the artwork was a "good" or

12  "great" investment, that the works would appraise for "many times" the price paid at the auction

13  and that the prices paid are "significantly below market value" support Plaintiffs' and the Class

14  members' reasonable belief that Park West had special skill and judgment regarding the value of

15  artwork.

16      102.    Until September 2008, Park West had a strict ALL SALES ARE FINAL and no

17  refund policy which was stated on the bid card and repeated on the Invoice

18      103.    A materially identical Invoice was given to Plaintiffs and the Class by Park West

19  for each auction purchase.  The Invoice is a two-sided pre-printed form document designed and

20  generated by Scaglione and Park West.   Plaintiffs and the Class had no opportunity to negotiate

21  or change any of its terms because it is handed to the successful bidder after making the bid and

22  after the hammer has gone down and after Plaintiffs and the Class had seen the bid card stating

23  ALL SALES ARE FINAL.  The setting of the auction and the language of the bid card

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 29
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

reasonably lead and is intended to lead a bidder to the conclusion that the sale was final at the sound of the hammer.

      (a)    The front of the Invoice records the purchaser's name and address with a list and description of the items purchased.  For shipboard auctions the name of the ship and date of the voyage is included.  At the bottom of the first page is a pre-printed paragraph (the language of which has not changed substantially over the years and over the 10-year exclusivity period with the Cruise Lines) acknowledging purchase and receipt of the Invoice and "agreeing" that no verbal agreements or representations remain in effect except as written on the Invoice.

      (b)    The back of the Invoice records "additional terms and conditions," including:

- "All sales are final…"

- "Appraisals represent our opinion of the price a client would have to pay to replace the work through a reputable retail art gallery.  We do not rely on third party auction prices or internet prices to arrive at the appraised value. We do not issue refunds if another appraiser has a different opinion than ours."

*See* Exh. B (Sample Invoice).

104.    Copies of the Invoice are given to Park West and the Cruise Lines.

105.    The purpose of the Invoice after the bid card is to seal the deal, to obtain a signature on the fraudulently induced contract from Plaintiffs and the Class members.  The Invoice is presented after the sale, after the hammer goes down, after the bidder is told "ALL SALES ARE FINAL" and with no statement or implication that the terms of the Invoice remained open for negotiation.

106.    The Invoice is unconscionable and unfair in that it is weighted entirely in favor of Park West.

- The contractual limitations clause runs to customers only--not Park West.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 30
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

- Park West sold the artwork as a good investment when Park West knew that the artwork had no investment value and had little chance to appreciate in value but the Invoice is designed so that a customer cannot reasonably challenge the sale.

- Park West represented that the artwork was sold at a price "significantly below market value" despite knowing that was not true.

- Park West sold the Appraisals as part of the transaction when it knew the Appraisals were worthless and phony and did not conform to any appraisal methodology of any professional association of appraisers.  The price of the Appraisals was placed on the Invoices (along with the price of the artwork).

- Park West sold Appraisals to reinforce the claim of investment value for the artwork, but the Appraisals and Invoices disclaim any liability with respect to the Appraisals, rendering them useless.

- Plaintiffs and the Class members were not sophisticated purchasers of art and justifiably relied on and were entitled to rely on Park West's touted expertise and judgment of value in the sale of artwork.

- The Invoices provide that no verbal agreements or representations shall have effect unless in writing, but the Invoices do not provide any details regarding the descriptions and representations made by Park West at the auction and Plaintiffs had no opportunity to see the paperwork containing the descriptions of the artwork (i.e., the Certificates of Authenticity and Appraisals) until weeks or months after the sale.

- The Invoices, which are provided to Plaintiffs and the Class after the hammer goes down and the sale is final, state that Park West can substitute the actual artwork that customers bid on for different or similar pieces.

- Park West makes customers pay for Appraisals but then disclaim all liability with respect to the accuracy, validity and usefulness of the Appraisals.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 31
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

- Park West provides potential customers with free alcohol as a means to entice potential customers to the auction and to facilitate bidding and purchasing of artwork.

107.    For years, Park West maintained an "ALL SALES ARE FINAL" position on its auction sales.  On September 1, 2008, in response to an onslaught of litigation against it, including these Actions, Park West launched its "40-40 program."  The new program promised that purchasers may return artwork for a full refund or exchange within 40 days of receipt of the work for a refund of the purchase price, less the buyer's premium (up to $1,000) plus shipping and handling.  For 40 months after the date of the Invoice, purchasers can exchange their purchase for another work of art from Park West of equal or greater value, but the work is selected by Park West.

108.    When Park West settles claims with disgruntled customers by refund or exchange, the settlement is always subject to a mutual confidentiality agreement, mutual releases and release of the Cruise Lines, thereby reinforcing the implication fostered by Park West that the Cruise Lines are parties to the Park West transactions. The confidentiality agreements also serve to further Park West's plan to fraudulently conceal the existence, nature and scope of its fraud from its customers.

109.    Passengers are encouraged to pay for their costly artwork by applying for a Park West Gallery branded credit card issued by HSBC called the "Park West Collectors Card." Application and approval for the Park West Collectors Card is accomplished instantly for the purchaser while at the venue, including onboard the ship through the use of the telephone or wires connecting to the shore and HSBC offices.  Park West advertises the availability of the Park West Collectors Card in the Cruise Lines' daily itineraries that each Cruise Line provides to its passengers each day.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 32
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

**7.     Scaglione, Park West and Fine Art Sales Certificates of Authenticity**

110.     As part of and in furtherance of the scheme alleged herein, Fine Art Sales, Scaglione and Park West issued buyers of Park West artwork "Certificates of Authenticity" that falsely represented the authorship of the works sold. *See* Exh. C (Sample Certificate of Authenticity).

111.     Plaintiffs and the Class members received Certificates of Authenticity from Scaglione, Park West or Fine Art Sales with each of their purchases from Park West at the auctions and private sales.  The Certificates of Authenticity were placed inside of the box containing the artwork purchased by Plaintiffs and the Class and were shipped to their homes *via* Federal Express, United Postal Service or U.S. Mail.

112.     The language contained in the Certificates of Authenticity describing the artwork mirrors the language contained in Park West's phony Appraisals and was materially deceptive and misleading with respect to the authenticity of the artwork purchased. Scaglione also signs the majority of the Certificates of Authenticity, but in the instances where Scaglione does not sign them, someone from , such as Morris Shapiro, signs the Certificates of Authenticity at Scaglione's, Park West's or Fine Art Sales' direction.

113.     Among other works, Plaintiffs and the Class purchased graphic prints represented to be originals by Salvador Dali.  Art experts agree that the market is flooded with Dali fakes. The Salvador Dali prints sold by Park West are particularly questionable.  The majority of the Dalis sold by Park West as originals or signed by the artist come from three sources:  the Albaretto collection, the Estrade (Les Huéres Claires) collection, and the Marc Ways collection. Each of these collections is surrounded by controversy.

(a)     The Albaretto collection (mostly Biblia Sacra prints) is comprised of a large volume of prints provenanced from the Albaretto family in Turin, Italy.  This collection has been the subject of a criminal investigation in Europe.  In 1987, Dali signed a notarized statement in Spain denouncing Albaretto "originals."  Any Dali with an Albaretto provenance is

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 33
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    not accepted in the Albert Field, "Official Catalog of the Graphic Works of Salvador Dali."  Park

2    West purchased exclusive rights to sell the Albaretto collection and resells the graphic prints at

3    auctions.

4                (b)    Les Huéres Claires was the French publishing house owned by Jean

5    Estrade that published *The Divine Comedy* in 1963 as an unsigned folio of 100 woodblock prints

6    after a Dali watercolor series of the same name.  The lithographs from this series were initially

7    unsigned.  Estrade commissioned Dali's signature on a large collection of the graphic prints (for

8    $5.00 per signature) and placed the blind stamp of his publishing house on them.  Park West

9    purchased this collection in the 1990s.  After 1996, Park West created and placed the Estrade

10    blind stamp on the prints it sold.

11                (c)    Marc Ways maintains that he was a personal friend of Dali some 30 years

12    ago and that over a period of 4 years, Dali signed between 150-160 Divine Comedy prints for

13    him for free.  Neither Dali's wife nor Dali's secretary, one of whom always travelled with the

14    artist at that time, recalled ever seeing Dali with Marc Ways. Park West sells signed Dali graphic

15    prints from the Marc Ways collection.

16          114.    Park West holds itself out as successful because of its self-proclaimed "integrity

17    and professionalism that have been a part of the business since its gallery first opened in 1969."

18    Park West further claims to rely on recognized scholars to document and to review its

19    collections.  Among these persons is Bernard Ewell ("Ewell"), who Park West maintains is "the

20    internationally recognized authority of Salvador Dali and appraiser of the Salvador Dali Museum

21    in St. Petersburg, Florida."[8]  Ewell could be seen for many years on Park West's website, touting

22    Park West's Dalis and stating:  "These pieces are real folks.  You can count on that."  *See*

23

24              [8] Mr. Ewell appears to no longer be formally associated with Park West, as he is no longer

25    mentioned on its website where he was once prominently featured as its resident Dalí expert.
      Mr. Ewell served as Park West's expert witness in *Park West Galleries, Inc. v. Phillips*, Case

26    No. 08-CV-12247-LPZ, pending in the Eastern District of Michigan (hereinafter "*Park West /*
      *FAR Litigation*").

THIRD AMENDED AND CONSOLIDATED CLASS ACTION        CHIMICLES & TIKELLIS LLP
COMPLAINT - 34                                 361 W. Lancaster Avenue
Case No. CV9-1178-RSL                         Haverford, PA 19041
                                         Telephone: (610) 642-8500
                                       Facsimile: (610) 649-3633

http://www.youtube.com/watch?y=5gtRx-orgw.  When a customer would contact Park West with concerns regarding authenticity of their Dali pieces, Park West would provide that customer with a packet of documents related to Ewell's purported "authentication" of the piece at issue.

115.    Ewell, testifying in the *Park West / FAR Litigation*, stated that Park West's exclusive on the Albaretto collection of Dali prints means that Park West is selling in a closed market where opinions of value must reflect the price Park West paid for the art because there is no other market that can offer a comparable.  Park West's Appraisals of Dalis from the Albaretto collection or any other collection do not disclose Park West's purchase price.

116.    Independent appraisals consistently reveal that Park West artwork is unauthentic, worthless or exorbitantly over-priced.  For example, "t[]he purchasers of these prints [*Biblia Sacra* and documents presented by Albarettos] paid in one case over $7,000 and in the other over $18,000 for what are described by the German detective as poster quality work with fake signatures on them, worth at most, if you like them, $75-150 for decoration."  "Investigators & Experts Say Park West at Sea Salvador Dali Prints Were Fakes," excerpted from ArtDally.org, Sept. 9, 2008.

117.    Similarly, Park West's former Dali expert Bernard Ewell stated in a *Money Magazine* interview in 1989 that an authentic Dali Divine Comedy print could command only $350-650.

118.    Bruce Hochman[9] of Salvador Dali Inc., testified under oath in *Park West Galleries, Inc. v. Phillips*, Case No. 08-CV-12274-LPZ (E.D. Mich.), that he regularly receives calls from unsuspecting Park West customers and frequently authenticates and appraises Park West Dali pieces.  Regarding Park West's Dali *Destino* prints, Bruce Hochman has repeatedly concluded:

---

[9] Like Theresa Franks, Park West has also brought a defamation suit against Bruce Hochman and others in *Park West Galleries, Inc. v. Phillips*, Case No. 08-CV-12274-LPZ, pending in the Eastern District of Michigan.  This case is coordinated with the *Park West / FAR Litigation*.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 35
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

> The Destino prints you have acquired from Park West Gallery in my opinion are not "original prints" by Salvador Dali. To be original prints, the artist Salvador Dali had to work onto a plate or stone with his own hand for the creation of a limited edition series. The Destino prints you own were not created by Salvador Dali as they were produced after his death Jan. 23rd 1989.
>
> The Destino prints you have are copies of some of the scenes from the short subject film "Destino" by Disney studios….
>
> In my opinion the Destino prints you acquired are "afters" and are worth about $100.00 each.

119.   Similarly, regarding Park West's Dali's *Biblia Sacra* #3-6, GA.99/41, #5-7, Mr. Hochman found that "none of the lithos were signed:"

> The prints were not signed. I have noticed that your print has a blue "Dali" signature. In my opinion it was not signed by Salvador Dali. Additionally, the Albaretto family knew that Albert Field was producing his [Dali's] book and never asked him to include any "signed" Biblia Sacra prints. Mr. Field states in his book, "The prints are not signed" cataloger. The book was done with Dali's full participation.
>
> I also find it strange that Albert Scaglione has "appraised" this litho. In the art world it is an absolute no-no for the owner to be the appraiser and have a vested interest in the sale.
>
> In my opinion your print is fake.

120.   And, regarding Park West's Dali's *Les Chevaux Surrealistes* IL/CXLV, Mr. Hochman concluded:

> After careful inspection, in my opinion, your print is not authentic… I have looked at the signature on your print. In my opinion it was done by an auto-pencil device. I have compared the signature to other Albaretto prints, they all are exactly alike. Lastly, forensic experts for a German police investigation have proven that the typewriter that was used to type the so called contracts for the Alberetto prints was typed on a typewriter that did not exist until 10 years after the contracts were dated.

121.   A Royal Caribbean passenger, among others, complained to the Florida Attorney General's Office about the authenticity of Park West artwork. While aboard the cruise ship, the passenger was subject to "a high pressure sales pitch," where the Park West salesperson explained that the pieces by Dali and Picasso were personally signed by them, "were rare and

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 36
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

valuable." The salesperson guaranteed that the signatures were authentic and that they have never sold a fraudulent piece of art. The salesperson also explained that Royal Caribbean would never let them sell Park West artwork aboard their ships if Park West was not completely legitimate. The passenger purchased several pieces of artwork, including a Dali and Picasso. Weeks later, the passenger received the artwork and certificates of authenticity. Concerned about the authenticity of the Dali signature, the passenger sought an independent opinion. The passenger was informed that the signature was a fake. Further research on the Picasso piece revealed that the average price for a similar piece from that series was only $2,593.00. Park West appraised the piece for $47,900.00 and the passenger paid $39,655.00. Thus, the appraisal was 15 times the price and the passenger paid 10 times the actual price. When the passenger tried to return the pieces and seek a refund, he was told all sales were final and that Park West has never sold a fraudulent piece of art.

### 8. Scaglione and Park West Appraisals

122. Plaintiffs and Class members also purchased Appraisals at the auctions that were charged for separately from the artwork but appeared on the Invoice and, like the artwork, were paid for by adding the price of the artwork or Appraisal to the ship's bill or by placing on the customer's Park West Collectors Card.

123. Park West sells to successful bidders the opportunity to purchase an Appraisal for an additional fee of $35 for the first Appraisal and $15 for each additional Appraisal. Sometimes the Appraisal is automatically tacked onto the purchase price for the artwork or is "complimentary" with the purchase of an expensive piece. The fine print of the Invoice disclaims any liability for the Appraisals making them worthless and contrary to generally accepted appraisal standards.

124. The Appraisals are mailed separately from the artwork *via* U.S. Mail to Plaintiffs and Class members at their home address after or about the time the artwork is delivered. The appraised value in the Appraisal is always greater than the purchase price paid by Plaintiffs.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 37
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

125.   Like the Certificates of Authenticity, Albert Scaglione signs most of the Appraisals.  In those instances where Scaglione did not sign the Appraisal, the Appraisal was signed at Park West's or Scaglione's direction and control, such as those Appraisals signed by Morris Shapiro or Albert Molina of Fine Art Sales.

126.   Also, like the Certificates of Authenticity, Park West's former expert Bernard Ewell, in an article in the *Arizona Republic* dated April 8, 2007, stated and repeated in testimony in the *Park West / FAR Litigation* that Park West Appraisals are "not independent" and that he perceived them as "high."  Ewell also stated, "Just be warned.  Almost invariably the price paid to Park West are [sic] higher than in other venues."

127.   The Appraisals are fraudulent and deceptive with the purpose and intent to mislead Plaintiffs about the meaning and content of the Appraisal and the value of the artwork purchased.  The Appraisals also served to lull Plaintiffs into a false belief concerning the value of their art purchases.

128.   Park West uses the phony Appraisals to validate the purchase price paid by Plaintiffs and to conceal Park West's misrepresentations by falsely fixing a value for the artwork at many times the purchase price.

129.   Plaintiffs and Class members relied on the representations concerning the Appraisals and the statements made in the Appraisals they would receive and did receive as proof that the purchases were a "good investment" and that the price paid for artwork would be "significantly below market value."

130.   The only reason that the Park West artwork appraises for above the dollar amount paid for it by Plaintiffs and Class members at the auctions (*i.e.*, the "hammer price" plus buyer's premium) is because Scaglione and Park West do the appraisals, guaranteeing a number higher than the hammer price.  A bona fide appraisal done by an independent appraiser would not value the artwork at "many times" the price that Plaintiffs and the Class paid for the pieces, but rather for a fraction of that price.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 38
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

131.    Scaglione and Park West knew, or recklessly disregarded that the representations made concerning the Appraisals were false and fraudulent.

132.    The Appraisal is a form letter that states:

> The following work of art has been examined by Park West Gallery.  In our opinion the current gallery retail replacement price for this work, including its frame is [$$$]…

*See* C (Appraisal).

133.    The auctioneers touted the Appraisals as a hook for purchase, and Park West never disclosed at the auction that the Appraisal would be performed by Scaglione or Park West, alone, without objectivity and without a generally accepted appraisal methodology.  The language of the Invoice referring to the Appraisal deliberately misstates and implies that Park West or its designate will employ an objective methodology to arrive at valuation for the Appraisal.

134.    The Park West Appraisal is not an independent, objective valuation of the artwork, but rather a phony, self-interested, fraudulent and biased misrepresentation designed to deceive Plaintiffs into believing that the purchase price paid for the artwork is a "good investment" and that the artwork was being sold at a price "significantly below market value." Scaglione stated in a declaration under oath that Park West's appraisal methodology is the methodology described in the Appraisal forms buyers received, which is no methodology.[10] Park West employs no generally accepted methodology to appraise the artwork other than Park West's "because I say so" or *ipse dixit* in valuation of the artwork.

135.    According to the American Society of Appraisers ("A.S.A."), when an appraiser has an interest in the property appraised (as Park West does here as the seller), it is unethical for

---

[10] *See* Plaintiff David Bouverat's Memorandum in Opposition to Defendant Park West's Motion for Summary Judgment, *Bouverat v. Park West Gallery, Inc.*, Case No. 08-21331 (S.D. Fla. Mar. 27, 2009) (declaration of Albert Scaglione, attached as Exhibit D to Bouverat's Affidavit, Dkt. No. 71)

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 39
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1  an appraiser to accept an assignment to appraise a property (here, appraise the value of the

2  artwork) unless there is full disclosure to the client. Park West does not make full disclosure.

3      136.    The Appraisals do not conform to the methodology of the Uniform Standards of

4  Professional Appraisal Practice or the methodology of any other recognized professional society

5  of appraisers.

6      137.    Moreover, the Appraisals were inherently misleading. In the Appraisals,

7  Scaglione or Park West represented that a "reputable art gallery" would pay the identified price

8  for the artwork, but never consulted or referenced any "reputable art gallery" other than Park

9  West. Thus, the Appraisals were essentially a statement of a fictitious price that Park West itself

10  should be willing to pay for the artwork. But Park West was never actually willing to repurchase

11  the artwork for the sale price (with the limited exception of the circumscribed "40-40" refund

12  policy it adopted under pressure in 2008), let alone for the "appraised" price. By omitting to

13  disclose that the only valuation the Appraisal would support would be Park West's own

14  interested opinion, and by appraising the artwork for a value greater than the hammer price, Park

15  West intentionally deceived Plaintiffs and the Class.

16      138.    For example, the Park West Appraisal given to Ms. Myra Kean, a plaintiff in

17  *Blackman*, for her Salvador Dali lithograph is false and misleading for several reasons. The

18  Appraisal states "signed in color pencil," but does not say signed by the artist. In good

19  appraisals, the appraiser does state that the work is "signed by the artist in pencil or in ink if that

20  is the case. The fact that "[m]ore than one year was spent researching and authenticating these

21  lithographs" is puzzling when in fact a recognized expert in the field can usually authenticate a

22  piece of artwork in minutes.

23      139.    Ms. Kean's Appraisal generally mentions "Bernard Ewell," but does not

24  specifically state Bernard Ewell's opinion on Ms. Kean's piece. It vaguely states that Mr. Ewell:

25          in commenting on the series stated, 'Having examined the original
            paintings, as well as…. the printed of the prints. It is frequently
26          difficult to tell they are not the original paintings. They are of a

THIRD AMENDED AND CONSOLIDATED CLASS ACTION          CHIMICLES & TIKELLIS LLP
COMPLAINT - 40                                          361 W. Lancaster Avenue
Case No. CV9-1178-RSL                                    Haverford, PA 19041
                                                      Telephone: (610) 642-8500
                                                      Facsimile: (610) 649-3633

> quality that would fool most viewers.  Truly, the coming together
> of the Albarettos, the Bible, and Dali resulted in a creation of a set
> of images that represent far more than the sum of the parts (I do
> not understand this phrase).  Even so, it is worth stating again that
> each image quite clearly can stand alone as an individual work of
> art by Salvador Dali.'

The "fidelity of the prints" language basically refers to how this copy looks like the original. The "frequently difficult to tell" language also refers to how this print is simply a reproduction and not an original.  The "stand alone as an individual work of art" language further highlights the unauthentic qualities of the piece.  Moreover, the appraisal does not discuss comparative works sold in either the public or private arenas or what Park West paid for the work since Park West was operating for this work in the closed market.

140.    Additionally, the terms of the Appraisal and the broad list of exclusions essentially dodge every description of the artwork that might establish originality or authenticity. A limited 5-year guarantee is not standard practice for authentic artwork.  Authentic artwork generally has a lifetime guarantee, as its authenticity does not change over time.

141.    Ms Kean, like Plaintiffs, received these Appraisals after purchasing the artwork from Park West when the pieces were delivered or sometime thereafter.  The Appraisals essentially excuse Park West from having anything to do with the artwork or verifying its legitimacy.

142.    Similarly, Plaintiff Lee's Salvador Dali *Divine Comedy* Appraisals by Park West are false and misleading for several reasons.  The Appraisals state "signed in pencil," "signed in ink," "signed in the plate," or "signed in the block."  The signatures referred to in both of the last two instances are permanent or integral part of the printing surface and consequently offers none of the assurances that are associated with the individually artist-signed impressions.  Therefore, the signatures are simply another line within the image and do not add authenticity or value.

143.    The "blindstamp" reference is simply an embossed stamp that does not have to be applied by the artist.  If it is from the Estrade collection, after 1996 Park West affixed the blind

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 41
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    stamp.  Some of the Appraisals generally mention "art has been examined by Park West

2    Gallery," but does not mention that this inspection represents their guarantee of the work's

3    authenticity nor does it cite any art expert or comparative works sold in either the public or

4    private arenas.

5         144.    Plaintiffs did not learn of or know about the deficiencies in the Appraisals at the

6    time of purchase.

7         145.    Scaglione and Park West knew, but never disclosed to Plaintiffs and the Class

8    that:

9              (a)    Dali forgeries abound in the art market, whether in the Park West auctions

10   or in other galleries, and Park West sells forged or suspect Dalis.  The presence of these forged

11   and suspect Dalis in the market impairs the value of the Dalis sold by Park West.  Nonetheless,

12   Dali is a prominent "hook" artist for Park West, and Park West systematically markets purported

13   Dali works as a good investment at the auctions and in the materials advertising the cruise ship

14   auctions.

15             (b)    Park West offers Rembrandts for sale at auction to provide support for the

16   aura of fine art. The Rembrandt prints offered for sale by Park West, which sometimes sell for as

17   much as $10,000 each, are in fact modern multiples are at best pulled from the copper plates

18   etched by Rembrandt or in the Master's studio. These plates are now purportedly owned by Park

19   West and there is no limit to the number of prints that can be made from these plates.  As such,

20   these prints are neither rare nor valuable.  Nor does Park West sell them "significantly below

21   market price."  Since they are derivative works, they lack the inherent scarcity and value of

22   artwork produced by a deceased Master during that Master's lifetime. Thousands of these

23   "original" Rembrandts are now available.  The prints have little chance of appreciation in value

24   because Park West can keep printing them.

25             (c)    Some of the Park West artwork offered for sale at auction is merely an

26   ink-jet print, little better than a poster, but cannot be discerned as such by the purchaser without

---

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 42
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

removing the frame (all artwork is framed when displayed shipboard).  Once again, since these derivative works can simply be printed at will, they have no inherent value beyond the value of the paper and ink, and they have no value whatsoever as investments.

(d)    The signed and numbered artwork from a particular series of multiples sold by Park west are either multiples from an extraordinarily large series, or are from one of several series of the same series and have little, if any, appreciation potential.  Park West, however, represents them to be a "good investment" and sold at a price "significantly below market value."  Park West only discloses the number in the series before the sale when the number is low, but never discloses if there is more than one series on the market, or if a new series can be expected or is even possible.  For example, Park West frequently does not even ship the item purchased to the buyer from the point of purchase (whether cruise line or hotel). Instead Park West frames and ships out an identical "original" work from its warehouse. As such, customers would not receive the same number print that they originally thought they were purchasing onboard the ship or at the land auction.

(e)    Park West does not disclose when Park West is the only dealer for a particular artist or work (such as Itzchak Tarkay and sometimes Peter Max), a factor that has a material impact on price and value, similar to the closed market for the Albaretto prints.  Park West artists often negotiate bulk sales of their work with Park West, thereby diminishing the value of the work and making Park West the sole or primary dealer for that artist or particular work.  Similarly, artists contract with Park West to "hand embellish" works from series to make them unique or valuable.  Peter Max multiples are sold at Park West auctions as originals because the artist signed a copy of the lithograph with a paintbrush (where the original lithograph was signed in pencil).

(f)    Park West knew that the appraised value it assigned to a work was a pre-cooked number that was not based on an independent appraisal in conformance with accepted

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 43
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

standards, but rather was simply the price Park West tagged on the work at its Michigan Gallery. That "price" is wholly illusory.

## C.    The Cruise Lines' Knowledge of the Scheme

146. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

147.    In addition, the Cruise Lines stored Park West inventory aboard their ships and unbeknownst to Plaintiffs, Cruise Line employees observed repeated sales of the same or substantially similar artwork during the many cruises.

148.    Park West never disclosed its financial relationship with the Cruise Lines to Plaintiffs and the Class.

149.    Despite Park West's efforts to fraudulently conceal the existence and nature of its fraudulent scheme, much has been written recently about the at-sea art auction market and Park West's activities therein, in particular.  For example, on July 16, 2008, the NEW YORK TIMES published an article in which it wrote:

> [O]ver the last two decades, auctioning "fine art" on cruises, often to first-time bidders who have never met a reserve or inspected a provenance, has become big business.
>
> The biggest player by far, with more than $300 million in annual revenue and nearly 300,000 artworks sold each year, is Park West Gallery, based in Southfield, Mich.  It handles such a high volume of art sales at sea that it bills itself as "the world's largest art dealer."

THIRD AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT - 44
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

> Park West sells art on the Royal Caribbean, Celebrity, Norwegian, Carnival, Disney, Holland America, Regent and Oceania lines. (Princess runs its own auctions in-house.)
>
> For the cruise-ship companies, Park West's auctions have become a revenue source like any other concession.  For the passengers the auctions are a popular form of onboard entertainment, like gambling or shopping or catching the shows.

Jori Finkel, *Art Auctions on Cruise Ships Lead to Anger, Accusations and Lawsuits*, NEW YORK TIMES, July 16, 2008.  According to the article, Park West had between $300 million and $400 million in annual revenue in 2007, with cruise ship sales accounting for roughly half that volume.  *Id*.  The remainder of Park West's sales, the article states, comes from sales onshore at special events like hotel auctions.  *Id*.

150.    The NEW YORK TIMES went on to describe the claims of cruise ship passengers who say they were cheated when they purchased works that they later discovered were not what they were purported to be.

> Yet some Park West customers say they did not get what they bargained for.
>
> One is Luis Maldonado, a businessman from the La Jolla section of San Diego with interests in finance and construction and a penchant for Latin American art.  He was touring the Mediterranean with his wife, Karina, on the Regent Seven Seas Voyager in November 2006 when they decided to stop by the Park West art auction promoted onboard.
>
> He was surprised to find artworks by Picasso and Rembrandt in the auction area, a lounge near the casino, where they were greeted with Champagne.  He gravitated toward the Picassos.
>
> There, he said, the auctioneer talked up two "museum-quality" Picasso prints appraised at more than $35,000 each and a trilogy of Salvador Dalí prints valued at $35,000 as a set.  Mr. Maldonado said the auctioneer described the works as "good investments," explaining that they were being offered at 40 percent off their "appraised value," with no sales tax.
>
> When he asked about the nature of Park West, he said he was told it was on par with Christie's and Sotheby's.
>
> It was easy to make the leap.  After all, he thought, it was a prestigious cruise, and he had gotten discounts on good wines

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 45
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

onboard before.  He started bidding, with little competition from the room, and stopped at several thousand dollars below Park West's appraised value on each.  He received an invoice marked "All sales are final."

It was only after Mr. Maldonado landed back in California that he did some research on his purchases.  Including the buyer's premium, he had paid $24,265 for a 1964 "Clown" print by Picasso.  He found that Sotheby's had sold the exact same print (also numbered 132 of 200) in London for about $6,150 in 2004.

In addition, he had paid $31,110 for a 1968 print, "Le Clown" by Picasso; Artprice.com, an online art database, showed it going for about $5,000.

**Perhaps most disturbing, he learned from The Official Catalog of the Graphic Works of Salvador Dalí, by the Dalí archivist Albert Field, that the pencil signatures on Mr. Maldonado's prints from Dalí's "Divine Comedy" series (prints without a signature in the woodblock itself) put them in Mr. Field's column of "unacceptable" prints.**

"Since Dalí did not sign any of these prints in black pencil, a pencil signature on one must be a forgery," Mr. Field wrote.

"It was very upsetting," Mr. Maldonado said.  "I'm not mad about spending $73,000.  I'm mad about spending $73,000 for works that I was told are worth more than $100,000 and are probably worth $10,000, if they're even real."

151.   The NEW YORK TIMES article also reported on a similar sale of a fake to another customer:

Dr. Venkatraman Srinivasan, a Pittsburgh cardiologist, has published an account of his experience with Park West at the Web site FineArtRegistry.com.  He said he paid around $30,000 for "Better World," by Peter Max, while on a Celebrity cruise from Vancouver, British Columbia, to Anchorage last August.

According to his account, he was told that it was an "original" painting worth about $50,000 and was dismayed to discover, when back on terra firma, that variations from the same series were priced as low as $3,000 or $4,000.  (Dr. Srinivasan declined to be interviewed for this article because of a confidentiality agreement he signed to obtain a refund from Park West.)

Debra and Timothy Vruble, a couple from Elgin, Ill., who both work in manufacturing engineering, took a Royal Caribbean cruise to the Bahamas in October 2006.  Onboard they bought a set of three "Divine Comedy" prints by Dalí from Park West for $19,468.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 46
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

An Auctioneer's Advice

"The auctioneer told us we could walk off the boat and sell them
for 20 percent more, and they would go up 20 percent a year,"
Mrs. Vruble said.  Back home, an outside appraisal for the resale
value of one of the three prints came in at $850 to $1,000.

Mrs. Vruble said she had gone to great lengths to obtain a refund
over the last 18 months, making "dozens of calls" and writing
"several letters" to Park West customer service representatives and
managers.

152.    In response to the foregoing claims, Park West's CEO and founder, Albert

Scaglione, wrote a letter to the editor of the NEW YORK TIMES, which it published on August 10,

2008.  The NEW YORK TIMES quoted Mr. Scaglione as stating:

Park West guarantees the authenticity of every work of art it sells.
The artwork we sell comes primarily from the artist's studio, and
we use the world's finest experts to authenticate all others.  Our
staff uses market-recognized tools, including reviews by a network
of accredited independent appraisers who adhere to the Uniform
Standards of Professional Appraisal Practices to appraise our art
work.

**In Park West's 40-year history, we have never sold a
nonauthentic work of art.**

Albert Scaglione, *Letter to the Editor*, NEW YORK TIMES, August 10, 2008. (emphasis supplied).

153.    On a website operated by Park West containing purported customer testimonials,

Park West makes the following false and misleading statement about its Certificates of

Authenticity:

The Park West Gallery® Research Library includes many rare and
out of print references.  Our research department catalogs each
work offered at our gallery and auctions.  When our seal is affixed
to a Park West Gallery® certificate of authenticity, collectors have
the assurance that the research was done according to the highest
standards, as used by museums and important international
auctions.

http://www.parkwestgalleriestestimonials.com (August 27, 2008).

154.    Park West falsely and misleadingly claims that it has never – knowingly or

unknowingly – sold a non-authentic work of art:

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 47
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

How can I be sure that my Park West® artwork is authentic?

Park West® has NEVER sold a work of art that is not authentic in it's [sic] nearly 40 year history!  You can be assured that each and every work of art Park West® sells has been reviewed and researched by our extensive network of definitive experts and scholars.  The Park West® Certificate of Authenticity GUARANTEES the artwork is absolutely genuine.

http://www.parkwestgallery.com/tour/faqs.aspx (August 27, 2008) (emphasis in original).  Park West continued making such statements as recently as December 23, 2009 in a filing in the *Park West / FAR Litigation.*

155.    Aggrieved purchasers also complained directly to the Cruise Lines about Park West artwork.  J. Peter Livingston and Ronald Lee (plaintiffs in related *Blackman* action) complained to Celebrity cruise line with respect to their purchase of Rembrandt's "The Golf Player" in February 2008.  In response to Mr. Lee's email, Celebrity responded with the following email deflecting any responsibility to Park West:

Date: Thu, 30 Jul 2009 10:04:38 -0400
Dear Mr. Lee:
  Thank you for your email regarding your cruise onboard the Celebrity Constellation.  We appreciate the opportunity to respond to any concerns.

  We regret your dissatisfaction with Park West Gallery.  As you know, Park West is independently contracted as art auctioneer for our ships.  Although their services are provided onboard for the convenience of our guests, Park West discerns and facilitates all that is necessary to resolve any concerns regarding art pieces purchased onboard.  Naturally, we only want to recommend the best vendors for our guests during their vacation; therefore, we sincerely apologize for the disappointment and inconvenience you have experienced in this regard.  If you have not already done so, in order to bring immediate attention to this matter, they may be personally contacted at:

Park West Gallery
29469 North Western Highway
South Old Michigan 48034
1-800-521-9654

  We also recognize that aside from the inconveniences you have endured, your overall perception of the cruise line has been affected as well.  While we appreciate your concern in that respect,

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 48
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

we want to assure you that our main objective is to provide the best cruise vacation experience in every aspect, and our guests are our number one priority.

Additionally, as stated in our Cruise Ticket Contract: "any onboard concessions (including but not limited to, gift shops, spas, beauty salon, art program, photography, formal wear concessions) are either operated by or are independent contractors on board the Vessel, on Transport or elsewhere and are provided solely for the convenience of the Passenger. Even though the Carrier shall be entitled to charge a fee and earn a profit for arranging such services, all such persons or entities shall be deemed independent contractors and are not acting as agents or representatives of the Carrier. Carrier assumes no liability whatsoever for any treatment, failure to treat, diagnosis, misdiagnosis, actual or alleged malpractice, advice, examination or other services provided by such persons or entities. Guest acknowledges that the Vessel's hair dresser, manicurist, art auctioneer, gift shop personnel, wedding planners and other providers of merchandise and personal services are employees of independent contractors and that Carrier is not responsible for their actions." Nevertheless, please accept our sincerest apologies for any disappointment experienced with our response.

Mr. Lee, we will continue in our efforts to consistently improve our product and services to meet the needs of our guests. We assure you that our dedication to serving our loyal guests remains constant, and remain genuinely apologetic for any displeasure experienced. Nevertheless, we truly look forward to the opportunity of welcoming you both back onboard the ships of Celebrity Cruises in the future.

Sincerely,
Tricia Brereton
Corporate Guest Relations

156.   Julian Howard and Sharon Day posted their experience of being sold phony Dali *Divine Comedy* prints when aboard a Royal Caribbean cruise on the *Adventure of the Seas* in 2008. When they complained to Royal Caribbean, Royal Caribbean responded with an e-mail deflecting any responsibility to Park West.

Sent: 05 December 2008 21:23
To: Sharon Day

Dear Mr. & Mrs. Howard:

Thank you for your email regarding your Royal Caribbean International cruise on board the Adventure of the Seas.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 49
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

> We appreciate the opportunity to respond to any concerns.  We regret your dissatisfaction with Park West Gallery.  As you know, Park West is independently contracted as art auctioneer for our ships.

From:  web cruise comments@Royal Caribbean.com [mailto:web cruise comments@Royal Caribbean.com).  Howard and Day also purchased from Park West at a private land sale after the cruise.  Royal Caribbean received its percentage of that land sale of $489,000.

157.  Park West counterclaimed for defamation against Julian Howard and Sharon Day when they sued to recover the purchase price of the complete set of the *Divine Comedy* by Dali purchased for $483,000.  In December 2009, a panel of three attorneys in Michigan found no defamation in a non-binding arbitration, assigning the case a value of $0.00 and finding that Howard and Day had a $250,000 case against Park West.  After the panel found that Park West's counterclaim was worth $0.00, Park West dismissed the case.  The Michigan Court of Appeals also issued an order bringing Royal Caribbean back into the case as co-defendants with Park West.  Royal Caribbean had been dismissed earlier based on the theory that only Park West was at fault.  The Court of Appeals disagreed and the lawyer representing Howard and Day explained that "the cruise line provides room for the auctions and makes upwards of 40% of all sales." http:www.theartnewspaper.com/articles/Lawyers-dismiss-Park-West-libel-case/20059 (January 6, 2010).[11]

158.  A customer relations executive at Royal Caribbean, Samantha Algar, has claimed in an interview that she was fired for helping a couple to recoup the money lost on a purchase of apparently fake art from a Park West cruise auction and for trying to prevent Park West from defrauding passengers.  http://www.youtube.com/watch?v=yRk11G8xc8I.

159.  Similarly, in February 2008, Mr. and Mrs. John Pfingsten of Tampa, Florida sailed on the Celebrity *Millenium*.  Mr. Pfingsten is 86-years-old.  He purchased over 30 pieces

---

[11] *Best v. Park West Galleries, Inc.*, Case No. 08-096952-CZ (Circuit Court Oakland County, Mich., filed Dec. 23, 2008).

THIRD AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT - 50
Case No. CV9-1178-RSL

of art from Park West under the hammer of auctioneer Natali Kenyon.  "An example of the purchase was Peter Max print from the his Patriotic series, Five Liberties and Flag, appraised internally by Park West for $6,200, sold to John Pfingsten for $3,275.  According to information provided by a source inside Park West, the cost of this print to Park West was between $380 and $680."  Mr. Pfingsten does not recall ordering 21 pieces of artwork, but does recall being served and drinking champagne.  Mr. Pfingsten's daughter complained to Park West customer services on March 8, 2009 and Park West's customer services representatives were argumentative and did not help her.  Mr. Pfingsten's daughter also complained to the Michigan, Delaware, and Florida Attorneys General Offices.  In response to the Michigan Attorney General's Office complaint, Park West's counsel simply claimed there is no evidence to support Ms. Pfingsten's claims and reasserted the legitimacy of Park West artwork.  Finally, Mr. Pfingsten's daughter complained to the Corporate Guest Relations of Royal Caribbean, who owns Celebrity Cruises, that same month.  Similar to other cruise line responses to complaints about Park West artwork sold aboard its ships, Royal Caribbean responded by disclaiming any responsibility for the actions of Park West Galleries.  http://www.fineartadvocacy.com/articles/2009/07/park-west-celebrity-cruise-art-auction-fraud-and-depective-trade-practices.php?cp=FBT (January 7, 2010).

160.     In November 2009, a Baltimore news station aired a piece investigating Park West's art auctions on board cruise ships.  The story featured a $12,000 Salvador Dali purchase by a Maryland couple, Richard and Tracy English, while onboard the Carnival cruise ship *Miracle* in July 2006.  The auctioneer told Richard English that the Dali was a "good investment" and that the piece would only grow in value.  However, when English attempted to sell the Dali, he was informed by an art gallery in California that the signature on the piece was not done by Salvador Dali.  English began investigating into the authenticity of his work and had the Dali examined by Frank Hunter, from the Fine Art Registry, and Nick Descharnes, a renowned Salvador Dali expert, who both opined that the signature on English's piece was, in fact, forged.  http://www.wbaltv.com/video/21638207/index.html.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 51
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    161.    Disgruntled purchasers also complained to the Michigan Attorney General's

2  Office regarding the cruise lines' (including Celebrity's and Carnival's) fraudulent practices with

3  Park West.

4          (a)    Indeed, there are 44 purchasers who registered complaints about Park

5  West's cruise ship auctions with the Michigan Attorney General's office.  These complaints

6  largely fit a familiar pattern: Park West selling art on cruise ships that is, at worst, forged, and, at

7  best, overpriced, while promoted as a "good investment."

8          (b)    For example, one couple complained that, during a Royal Caribbean

9  Cruise, they were "approached by several salespersons and the auctioneer," and "shown a myriad

10  of art pieces" during a "high pressure sales pitch."  They were told that the artwork, including the

11  signatures, was authentic and that the works would not decrease in value.  The salespersons also

12  "played up their association with Royal Caribbean Cruises."  As a result, the couple purchased

13  several pieces of artwork and incurred expenses totaling $62,156.80.  However, upon consulting

14  an art dealer, they discovered that the *Inferno 8* etching by Salvador Dali had a forged signature,

15  and that the other Dali may have a forged signature as well; they also learned that the price they

16  had paid for the Picasso work – $33,655 – far exceeded the average price of similar pieces from

17  the same series. ($2,593).  Their October 2008 request for a refund from Park West was denied.

18          (c)    Another complaint came from a woman whose elderly father purchased

19  overpriced artwork at a Park West auction while aboard the Celebrity *Millenium* while "under

20  the influence of too much alcohol."

21          (d)    Several purchasers received defective and damaged artwork, and in many

22  instances, artwork that was far different from the artwork that they had agreed to purchase.  In

23  one case, a complainant agreed to purchase an "original work of art" during a cruise. However,

24  the complainant soon learned that the piece was not original.  Moreover, the piece had "been

25  altered" and had "smudges all over the canvas."  Further, the piece featured a lower quality

26  frame than the piece complainant agreed to purchase while aboard the cruise.  In another case, a

THIRD AMENDED AND CONSOLIDATED CLASS ACTION      CHIMICLES & TIKELLIS LLP
COMPLAINT - 52                                    361 W. Lancaster Avenue
Case No. CV9-1178-RSL                              Haverford, PA 19041
                                               Telephone: (610) 642-8500
                                               Facsimile: (610) 649-3633

1    complainant's thumb was cut by a screw protruding through the front of the painting purchased

2    from Park West.  Three other paintings purchased by this complainant were also received in

3    unsatisfactory condition, but Park West refused to provide a refund for these three paintings.

4           (e)     In a few cases, purchasers never received the purchased artwork at all,

5    with Park West citing "unavailability" as an excuse.  Yet, during the auction, Park West

6    personnel represented that "once the gavel comes down, you own it."  Worse, in these

7    "unavailability" cases, rather than issuing a refund, Park West pressures purchasers to settle for

8    "alternative" pieces of artwork.

9           (f)     In one case, a Park West auctioneer announced that a piece was up for

10   "twenty seven hundred," but after the complainant placed a bid at that price, she was told that

11   she had agreed to purchase the piece for twenty-seven *thousand*.  Although the complainant

12   "immediately reported the error," Park West was unwilling to recognize that any error had

13   occurred.  The complainant was then asked if she wanted to purchase a different set, a collection

14   of works by Picasso, Miro and Chagall, for $17,000 instead.  Although the complainant resisted,

15   she was told that "this was the best that they could offer us and all sales were final."  As a result,

16   complainant was forced to "reluctantly agree[]" to purchase the $17,000 artwork, or else be stuck

17   paying $27,000 for the piece she had agreed to buy for $2,700.  The replacement collection was

18   "rushed onto the [auction] block and put up for bidding," with the "auctioneer rushing through a

19   bidding call" in order for the complainant to purchase the collection for $17,000 in what was, in

20   effect, a sham auction. She later determined that the collected works she purchased may

21   themselves be inauthentic copies worth far less than Park West had represented, but Park West

22   refused to address her concerns.

23          (g)     Another complaint involved a purchase at a Park West auction while

24   aboard a Carnival cruise; the auctioneer encouraged the purchasers to buy what he described as

25   "an authentic etching by Pablo Picasso, signed and created by [Picasso] himself," representing

26   that the etching was "one of the best investments" that they could make and that the $17,450

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 53
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

selling price represented a savings of "nearly 30% of what the painting was worth." After making the purchase and returning to New York, the purchasers learned from an independent art auctioneer and expert that the artwork was not authentic, and was merely a print. A second art appraiser confirmed this finding. An appraisal by Sotheby's valued the print at between $1,500 and $2,000. Nonetheless, Park West denied the request for a refund.

(h)   At least two of the complaints were copied or forwarded to Royal Caribbean. There is no evidence in the Attorney General's records, obtained by Plaintiffs' counsel, that Royal Caribbean responded to the complaints.

(i)   The complaints to the Michigan Attorney General also raised the issue of the Appraisals, with people claiming that they were misleading. Park West's response to these complaints was striking. In an April 7, 2009 letter to the Attorney General, Park West explained that "Park West appraisals are prepared for insurance purposes and represent replacement value. They are the identical prices that would be charged to the retail buyer if purchasing from our gallery walls, which is the environment in which one would need to replace the work of art insured." Thus, Park West admits that the Appraisals are simply statements of what they hope they could sell the work for – rather than an appraisal that indicates the work's worth on the market, a fact that was never disclosed to Plaintiffs.

162.   Park West sold alleged hand-signed lithographs from "Picasso Barcelona Suite," for over $100,000 each. "One of the self-educated inventory 'researchers' employed by Park West, sent a letter to the Picasso Museum in Barcelona requesting authentication of the signed Park West Gallery collection of Picasso prints." When the Picasso Museum refused to authenticate the prints, Park West suddenly removed the "Barcelona Picasso Suite" from its walls and the staff was instructed to never discuss these prints again.

http://www.fineartadvocacy.com/articles/2009/10/park-west-gallerys-picasso-barcelona-suite-lithographs-breaking-news-php (January 8, 2010).

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 54
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

163.     A February 21, 2009 press release reports that "Park West Gallery ordered all ship auctioneers to stop selling the company's large stock of Salvador Dali prints and return all unsold inventory to headquarters in Southfield, Michigan."  Carnival was the first cruise line to issue the ban, with others following thereafter.  Park West has similarly withdrawn prints from other masters, including Picasso and Chagall.  "This follows Park West's closing down of its land-based art auctions, attested to by the company's owner, Albert Scaglione in sworn declaration."[12]

### 1.     Litigation with Fine Art Registry

164.     As reports of Park West's wrongdoing began to surface, an organization called Fine Art Registry ("FAR"), which styles itself as a general blog for communications and news of the art world, began reporting the experiences of Park West Cruise Line purchasers.  In response, Park West attempted to silence such reports.

165.     On April 9, 2008, Park West sued Washington author David Charles Phillips in Oakland County, Michigan, Case No. 08-090708-CZ who wrote for the Fine Arts Registry Blogsite.  The case was removed to the United States District Court for the Eastern District of Michigan on May 22, 2008, where it was filed as Case No. 08-12274, the *Park West / FAR Litigation*.  This lawsuit alleges defamation and related causes of action with respect to articles that Phillips wrote about Park West's cruise-related business practices.  Park West's auctions were a blatant attempt to intimidate potential critics, whistleblowers, journalists, and customers from investigating and publicizing the truth about Park West's shipboard auctions.

166.     Park West filed another suit on April 11, 2008 in Oakland County, Michigan against FAR itself and its Arizona-based founder Theresa Franks, and a California-based art analyst Bruce Hochman, who is not associated with FAR, but whom FAR interviewed for its website, making similar allegations as in the *Phillips* case (Case No. 08-090750-CZ).  This case

---

[12] http://www.1888pressrelease.com/park-west-gallery-stops-selling-dali-prints-on-all-cruise-sh-pr-101502.html

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 55
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1   was also removed to the United States District Court for the Eastern District of Michigan, where

2   it was consolidated with the suit against Phillips and remains pending as Case No. 08-12247.

3   The two cases are now pending before the same Judge on post-trial motions having gone to trial.

4       167.    A jury returned a verdict of zero on Park West's claims for defamation against

5   Phillips, Franks and Hochman and awarded $ 500,000 in damages to Franks and FAR on a

6   Lanham Act claim against Park West.

7       **2.**    **Litigation with Gary Benfield**

8       168.    In 2005, an England-based artist named Gary Benfield filed a copyright

9   infringement lawsuit against Park West, Keaton, Inc. (d/b/a Park West at Sea), and UK

10  Acquisition Company ("UK"), a company wholly-owned by PWG.  Also named as defendants

11  were Carnival, Holland, Royal Caribbean, and Celebrity cruise lines.

12      169.    Benfield alleged that he had contracted with London Contemporary Art ("LCA")

13  to produce a series of prints.  The agreement authorized LCA to produce and distribute limited

14  edition copies of Benfield's original artwork.  The contract with LCA was subsequently assigned

15  to UK.  In creating the limited edition pieces, LCA overprinted the agreed upon number of prints

16  (which is common practice in printmaking) to assure quality for the numbered works. Benfield

17  further alleged that, instead of destroying the waste, LCA secretly kept the overproduced prints,

18  forged Benfield's signature on them, and then sold the prints on cruise ship art auctions and

19  elsewhere without Benfield's knowledge.  The allegations stated that both Park West (*via*

20  UK/LCA) and the cruise lines profited in the millions from selling these unauthorized pieces of

21  art.  In February 2006, the case settled and Benfield voluntarily dismissed his case without

22  prejudice.

23  **D.**    **Facts Related to Plaintiffs**

24      **1.**    <u>**Plaintiffs Bohm and Lee**</u>

25      170.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth.

26

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 56
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

171.    Plaintiff, Joseph Bohm ("Bohm") is a 74-year-old retiree residing in Glen Oaks, New York.  Bohm is the joint purchaser with Plaintiff John Lee of artwork purchased from Park West at shipboard auctions on a Celebrity cruise to the Caribbean in 2002 and a Carnival *Victory* cruise to the Caribbean in September 2004.

172.    Plaintiff, John Lee ("Lee") is a retiree, residing in New York, New York.  Lee is a joint purchaser with Bohm of artwork purchased at the Park West shipboard auctions on a Celebrity cruise to the Caribbean in 2002 and a Carnival *Victory* cruise to the Caribbean in September 2004.

173.    While cruising on both the Carnival and Celebrity cruise ships, Bohm and Lee received a cruise ship itinerary from the Cruise Line each day that listed all of the available activities and/or events that would take place that day.  The daily itinerary provided to Bohm and Lee by Carnival and Celebrity advertised each of the Park West art auctions and events that would take place throughout the duration of the cruise.  The itineraries received by Bohm and Lee were substantially similar to the ones described herein.

174.    Bohm and Lee arranged for their 2002 Celebrity cruise to the Caribbean *via* a telephone call placed by Bohm directly to Celebrity's reservation department.  The tickets were paid for using a credit card and by paying the credit card company through either an electronic funds transfer or by check delivered *via* U.S. Mail.  The cruise tickets were delivered to Bohm and Lee at their homes *via* U.S. Mail.

175.    Bohm and Lee arranged for their September 2004 Carnival cruise to the Caribbean *via* a telephone call placed by Bohm directly with Carnival's reservation department.  The tickets were paid for using a credit card and by paying the credit card company through either an electronic funds transfer or by check delivered *via* U.S. Mail.  The cruise tickets were delivered to Bohm and Lee at their homes *via* U.S. Mail.

176.    Plaintiffs Bohm and Lee are not sophisticated purchasers of art:

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 57
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

(a)      Plaintiffs purchased a total of 12 pieces of art after attending several auctions on their Celebrity and Carnival cruises.  Plaintiffs purchased Appraisals for many of the works that were purchased from Park West.

(b)      At each auction, Park West attempted to loosen up passengers by serving champagne.

(c)      Plaintiffs purchased the following pieces of art from Park West using a bid card while on their Celebrity and Carnival cruise ships:

| Artist | Work | Description | Hammer Price | Buyer's Premium | Invoice Amount | PW Appraisal Amount | PW Appraisal Date | Cruise Line |
|--------|------|-------------|--------------|-----------------|----------------|---------------------|-------------------|-------------|
| Erte | Black Magic | Lithograph in color on Somerset paper | $1,555.00 | $233.25 | $1,823.25 | $4,200.00 | 9/26/2002 | Celebrity |
| Savador Dali | Divine Comedy – Inferno 5 | Wood engraving in color on Rives paper after a watercolor | $701.00 | $105.15 | $806.15 | $2,350.00 | 11/23/2004 | Carnival |
| Salvador Dali | Divine Comedy – Purgatory 22 | Wood engraving in color on Rives paper after a watercolor | $701.00 | $105.15 | $806.15 | $2,350.00 | 10/29/2004 | Carnival |
| Alfred Gockel | Las Olas Blues III | Giclee in color on canvas. | $1,090.00 | $163.50 | $1253.50 | $1,650.00 | 12/8/2004 | Carnival |
| Thomas Kinkade | Wind of the Spirit | Offset lithograph in color on premium paper | $231.00 | $34.65 | $265.65 | $650.00 | 11/26/2004 | Carnival |
| Thomas Kinkade | Guardian Castle | Offset lithograph in color on premium paper | $220.00 | $33.00 | $253.65 | $595.00 | 11/24/2004 | Carnival |
| Thomas Kinkade | Mountain Majesty | Offset lithograph in color on premium paper | $231.00 | $34.65 | $265.65 | $650.00 | 12/1/2004 | Carnival |
| Anatole Krasnyansky | Rapture II | Serigraph in color on wove paper | $1,093.00 | $163.95 | $1,256.95 | $1,850.00 | 11/26/2004 | Carnival |
| Martiros | Golden Shimmer | Serigraph in color on paper | $2,100.00 | $315.00 | $2,415.00 | $3,800.00 | 12/22/2004 | Carnival |

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 58
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

| Peter Max | Liberty and Justice For All | Mixed media with acrylic painting and color lithography on paper | $3,800.00 | $570.00 | $4,370.00 | $6,495.00 | 11/23/2004 | Carnival |
|---|---|---|---|---|---|---|---|---|
| Peter Max | God Bless America II | Mixed media with acrylic painting and color lithography on paper | $4,200.00 | $630.00 | $4,830.00 | $6,395.00 | 12/1/2004 | Carnival |
| Peter Max | God Bless America – With Five Liberties | Mixed media with acrylic painting and color lithography on paper. | $3,900.00 | $585.00 | $4,485.00 | $6,795.00 | 11/23/2004 | Carnival |
| Rembrandt | The Artist's Mother With Her Hand on Her Chest | Etching on Ingres d'Arches off-white laid paper (watermark) with large margins | $1,483.00 | $222.45 | $1,705.45 | $2,195.00 | 11/19/2004 | Carnival |

(d)  All purchases were made while the Celebrity and Carnival ships were cruising in international waters.

(e)  The auctioneers represented to Bohm and Lee that the artwork was a "good investment" and that it would appraise for "many times" the price paid at the auction.

(f)  The works purchased by Plaintiffs are not a good investment and have little (if any) likelihood of appreciating in value.

(g)  Plaintiffs each opened an HSBC Park West Collectors Card in 2004 while cruising on a Carnival ship.  The Park West Collectors Card was advertised by Park West to passengers on board the Carnival cruise ship.  Park West solicited and promoted their Collectors Card by offering free or promotional pieces of art or auction dollar credit to passengers who opened a Park West Collectors Card account (and who purchased artwork using the Collectors Card) while on the Carnival Cruise.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 59
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1          (h)     Plaintiffs used their Park West Collectors Cards to purchase the artwork

2   they bought from Park West on their Carnival cruise.  The artwork purchased on the Celebrity

3   cruise was paid for by placing the balance on their ship's bill and then paying the ship's bill with

4   Lee's credit card.  Lee then paid his credit card bill each month by either an electronic funds

5   transfer or by sending a check *via* U.S. Mail.  The purchase price for all of the artwork bought

6   from Park West while on Celebrity and Carnival cruise ships totaled approximately $24,713.15

7   Plaintiffs paid the hammer price plus a buyer's premium, as well as costs for framing, shipping

8   and handling.

9          (i)     Bohm and Lee received Invoices from Park West for each of the pieces of

10   artwork purchased on their Celebrity and Carnival cruises that are substantially similar in all

11   material respects to the ones described in this Complaint.  Each Invoice was provided to

12   Plaintiffs while on board the Celebrity and Carnival ships at the time of purchase.

13          (1)     Bohm and Lee bid on artwork at the auctions, and where they were

14   the successful bidders, they were committed to purchase the artwork before they were presented

15   with an Invoice. The bidding paddle had terms and conditions regarding the sale including a

16   statement that ALL SALES ARE FINAL.  Bohm and Lee met with the auctioneer after the

17   auction to finalize the paperwork for their purchases and received Invoices for their purchases at

18   that time. Lee signed only 4 out of the 12 Invoices presented to him for his purchases made in

19   2002 and only signed some (not all) of the Invoices for his purchases in 2004.

20          (2)     At the auctioneer's invitation, Bohm and Lee attended the private

21   sales held shipboard after the auction closed down. Bohm and Lee also made purchases at the

22   private sales but were not told about any special terms and conditions in the Invoices.

23          (3)     The terms of the Invoices were never discussed before the auctions

24   or at the private sales, including the existence of any shortened statute of limitations provisions.

25   Bohm and Lee were never given the opportunity to read anything or to negotiate a change in any

26

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 60
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

terms. The hammer had already gone down on all of their bids and they were the purchasers when Bohm and Lee received their Invoices.

(j)     Plaintiffs received Certificates of Authenticity for the artwork at their residences in New York *via* U.S. Mail.  The Certificates of Authenticity were included in the box with each shipment of art. Plaintiffs' Certificates of Authenticity are substantially similar to the ones described herein.  *See* Exh. C (Sample Certificate of Authenticity).

(k)     Plaintiffs purchased Appraisals from Park West for a majority of the pieces they purchased from Park West.  The Appraisals were sent to Bohm and Lee at their residences in New York *via* U.S. Mail.  In each of the Appraisals purchased by Plaintiffs, the artwork "appraised" for a price over the hammer price but only because Park West did the appraisal.  The Appraisals were deceptive and designed to validate the auctioneers' misrepresentations at the auctions – that the artwork was a good investment – by "appraising" the works for amounts in excess of the purchase price.  The Appraisals received by Bohm and Lee are identical in all material respects to the Appraisals described herein.  *See* Exh. D (Sample Appraisal).

177.    The Appraisals purchased state on their face, "[t]he current gallery retail replacement price for this work, including its frame, is:  [$$$]…." On the reverse side of each, the "Terms of Appraisal" states:

> Method of Appraisal
> This appraisal represents our opinion of the price a willing buyer
> would pay a willing seller to acquire the artwork, with neither
> being under a compulsion to sell or buy.  In making this
> determination we rely on gallery prices of reputable art galleries
> and other reliable price data and lists.  We do not rely on third
> party auction prices or internet prices to arrive at appraised value.

178.    But for Park West's misrepresentations and Celebrity's and Carnival's complicity and facilitation about the investment value and the appraisal value of the artwork, Bohm and Lee would not have bid on or purchased the artwork.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 61
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

179.   On February 11, 2005, Bohm and Lee purchased the following artwork from a Park West on-land art auction in Uniondale, New York:

| ARTIST | WORK | HAMMER PRICE | BUYER'S PREMIUM | SHIPPING/ FRAMING | APPRAISAL COST | PURCHASE PRICE | APPRAISAL VALUE FROM PW |
|--------|------|--------------|-----------------|-------------------|----------------|----------------|-------------------------|
| Peter Max | Zero Prism | $2,000.00 | $300.00 | $0 | $35.00 | $2,264.38* | $5,495.00 |

* Purchase price includes a discount of half of the buyer's premium ($150) and a credit of $100.

(a)   Bohm and Lee received a catalogue in the U.S. Mail from Park West at Lee's New York residence advertising a local land-based art auction in Long Island at the Marriott Hotel in February 2005.  Bohm and Lee attended this two-day event and were treated to a free meal and free drinks on the first day of the event, as well as free drinks on the second day of the event.  The dinner was followed by a preview and an auction on the first day.  The second day also consisted of a short preview followed by an auction.  Plaintiffs attended all of these events.

(b)   Lee placed the total amount of this purchase on his Park West Collector's Card.

(c)   Park West used the same uniform sales pitch and techniques at its land-based auctions that they do on their cruise line auctions, described herein.

180.   Bohm and Lee continued to believe in the validity of the Appraisals and that the value of their Park West purchases were as appraised by Park West until 2008.

181.   In January 2008, Bohm tried to sell some of the artwork that he purchased from Park West. He contacted some forty (40) galleries inquiring as to whether they had any interest in purchasing his artwork.  He sent letters and photographs of the artwork to the galleries.  None of the galleries contacted responded except for one, whose representative informed Bohm that

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 62
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1  the frames were worth more than the pictures and offered to purchase a sculpture of Plaintiff's

2  that was not purchased from Park West.

3      182.    On July 16, 2008, an article appeared in the *New York Times* entitled "Art

4  Auctions on Cruise Ships Lead to Anger Accusations and Lawsuits," by Jori Finkel.  The article

5  detailed sales of low value or worthless "artwork" by Park West at shipboard auctions conducted

6  in international waters, employing representations that the artwork offered by Park West was

7  "museum quality" or "good investments."  The article further detailed the difficulty purchasers

8  encountered in obtaining any satisfaction from Park West on their complaints.  The article stated

9  that whenever there was a settlement with a disgruntled customer, Park West required

10  confidentiality. Lee saw the *Times* article and sent it to Bohm.

11      183.    On August 18, 2008, Bohm wrote a letter that he sent by U.S. Mail to Scaglione

12  in Southfield, Michigan, complaining that the artwork he purchased as a "good investment" was

13  of very low value and was not worth the purchase price. In the letter, Bohm also noted that, even

14  though Park West's Appraisals were for amounts significantly more than what Plaintiffs had

15  paid, sometimes up to three times more than the hammer price, no gallery had expressed an

16  interest in purchasing the artwork at any price.

17      184.    Bohm received a telephone call from a Park West representative at his New York

18  residence in response to his letter to Scaglione, where Bohm attempted to reach a compromise by

19  buying back his artwork for the full purchase price. Bohm also threatened to file a  lawsuit

20  against Park West.

21      185.    The Park West representative refused to buy back and refund Bohm's purchase

22  price for the artwork but offered instead to make an exchange. The Park West representative also

23  threatened Bohm that if he brought a legal action against Park West that was "without merit, he

24  would be responsible for Park West's *counsel fees* and litigation costs."  (Emphasis added).

25  Bohm wrote Park West a latter declining their offer for exchange and advised Park West that he

26  would be contacting his attorney.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 63
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

186.    Bohm and Lee did not communicate with either Celebrity or Carnival with respect to this dispute and thereafter contacted counsel.

## 2.    **Plaintiff Sean Mullen**

187.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth.

188.    Plaintiff Sean Mullen ("Mullen" or "Plaintiff") is a citizen and resident of Washington, District of Columbia.  Mullen purchased artwork in December 2003 on board the Royal Caribbean cruise ship *Serenade* and in May 2005 on board the Holland America cruise ship *Zuiderdam*.

189.    While on both the Royal Caribbean or Holland America cruises, Mullen received a cruise ship itinerary from both Royal Caribbean and Holland America each day that listed all of the available activities and/or events that would take place that day.  The daily itinerary provided to Mullen by Royal Caribbean or Holland America advertised each of the Park West art auctions and events that would take place throughout the duration of the cruise.

190.    Mullen purchased the tickets for each of the cruises online using a credit card and then paid the credit card company through an electronic funds transfer.  The cruise tickets were delivered to Plaintiff *via* U.S. Mail.

191.    Plaintiff is not a sophisticated purchaser of art:

(a)    Mullen purchased a total of eight pieces of art after attending all of the art auctions on his Royal Caribbean and Holland America cruises.  While cruising on the Royal Caribbean *Serenade* in December 2003, Plaintiff purchased three pieces of artwork and received two (2) "free" or promotional gift pieces from Park West.  While cruising on the Holland America *Zuiderdam* in May 2005, Plaintiff purchased three pieces and received $500 in auction credit dollars.  Plaintiff purchased an appraisal for three of the pieces that he purchased from Park West.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 64
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

(b)      Mullen attended all of the auctions on each ship and, at each auction, Park West attempted to loosen up passengers, including Mullen, by serving champagne.

(c)      Plaintiff purchased the following pieces from Park West while on the Royal Caribbean cruise (including free/promotional pieces using a bid card):

| ARTIST | WORK | HAMMER PRICE | BUYER'S PREMIUM | SHIPPING/ FRAMING | APPRAISAL COST | PURCHASE PRICE | APPRAISAL VALUE FROM PW |
|--------|------|--------------|-----------------|-------------------|----------------|----------------|-------------------------|
| Itzchak Tarkay | Indigo Chapeau | $0 | $0 | $0 | N/A | $0 | N/A |
| Fanch | Overlooking Chicago | $125.00 | $18.75 | $0 | N/A | $143.75 | N/A |
| Anatole Krasnyansky | Venice Yellow Sunset | $0 | $0 | $0 | N/A | $0 | N/A |
| Fanch | Dalinian Skyscrapers | $1,250.00 | $187.50 | $150.00 | N/A | $1,437.50 | N/A |
| Fanch | Interior With Buddha | $270.00 | $40.50 | $35.00 | N/A | $345.50 | N/A |

(d)      All purchases were made while the Royal Caribbean ship cruised in international waters.

(e)      Plaintiff purchased the following pieces of art while attending Park West auctions held on the Holland America cruise ship using a bid card:

| ARTIST | WORK | HAMMER PRICE | BUYER'S PREMIUM | SHIPPING/ FRAMING | APPRAISAL COST | PURCHASE PRICE | APPRAISAL VALUE FROM PW |
|--------|------|--------------|-----------------|-------------------|----------------|----------------|-------------------------|
| Linda le Kinff | Odile | $495.00 | $74.25 | $50.24 | $15.00 | $524.25 (minus $500 credit) | $795 |
| Marc Chagall | Bay of Angels | $1,550.00 | $232.50 | $67.33 | $35.00 | $1,732.00 | $2,950 |
| Salvador Dali | Divine Comedy – Purgatory 1 | $6,345.00 | $951.75 | $117.52 | $15.00 | $7,251.75 | $10,995 |

(f)      All purchases were made while the Holland America ship cruised in international waters.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 65
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

(g)     The auctioneers represented to Mullen that the artwork was a "good investment" and that they would appraise for "many times" the price paid at the auction.

(h)     The works purchased by Plaintiff are not a good investment and have little (if any) likelihood of appreciating in value.

(i)     Plaintiff paid for all of his artwork by placing the amount on his ship's bill and by paying the ship's bill with a credit card.  Mullen would then pay his credit card statements each month by electronic funds transfer.  The purchase price for all of the artwork bought from Park West while on the Royal Caribbean and Holland America cruise ships totaled approximately $11,235.34.  Plaintiff paid the hammer price plus a buyer's premium, as well as costs for shipping and handling.

(j)     Mullen was presented with Invoices from Park West for each of the pieces of artwork purchased on each of his cruises that are substantially similar in all material respects to the ones described in this Complaint. Each Invoice was provided to Plaintiff while on board the Royal Caribbean or Holland America ship at the time of purchase. .

(1)     Mullen bid on artwork at the auctions, and where he was the successful bidder, he was committed to purchase the artwork before he was presented an Invoice. Mullen met with the auctioneer after the auction to finalize the paperwork for his purchase and received an Invoice for his purchase at that time. Mullen was not told about any special terms and conditions in the Invoice.

(2)     Mullen also attended a private sale which was held after the close of the auction onboard the ship. Mullen negotiated with the auctioneer over the price of the piece of artwork he was purchasing, but did not receive the Invoice for his purchase until after he had negotiated the purchase price. There were no negotiations for the terms contained in the Invoice.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 66
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

(3)     The terms of the Invoices were never discussed before the auctions or at the private sales, including the existence of any shortened statute of limitations provisions. Mullen was never given the opportunity to read anything or to negotiate a change in any terms. The hammer had already gone down on all of their bids and they were the purchasers when the Hatters received their Invoices.

(k)     Plaintiff received Certificates of Authenticity for the artwork at his residence in Washington, D.C. *via* United Postal Service or Federal Express.  The Certificates of Authenticity were included in the box with each shipment of art.

(l)     Plaintiff purchased three Appraisals from Park West. The Appraisals were sent to Mullen at his residence in Washington, D.C. *via* U.S. Mail.  In each of the Appraisals purchased by Plaintiff, the artwork "appraised" for a price over the hammer price but only because Park West did the appraisal.  The Appraisals were deceptive and designed to validate the auctioneers' misrepresentations at the auctions – that the artwork was a good investment – by "appraising" the works for amounts in excess of the purchase price.  The Appraisals received by Mullen are identical in all material respects to the Appraisals described herein. *See* Exh. D (Sample Appraisal).

192.    Each Appraisal Plaintiff purchased states on its face, "The current gallery retail replacement price for this work, including its frame, is: [$$$]...." On the reverse side of each, the "Terms of Appraisal" states:

> Method of Appraisal
> The appraisal represents our opinion of the price a willing buyer would pay a willing seller to acquire the artwork, with neither being under a compulsion to sell or buy.  In making this determination we rely on gallery prices of reputable art galleries and other reliable price data and lists.  We do not rely on third party auction prices or internet prices to arrive at appraised value.

193.    But for Park West's misrepresentations concerning he investment value and appraisal value of the artwork and Royal Caribbean's and Holland America's complicity and facilitation, Mullen would not have bid on or purchased the artwork.

194.    Mullen continued to believe in the validity of the Appraisals and that the value of his Park West purchases were as appraised by Park West until 2008.

195.    On July 16, 2008, an article appeared in the *New York Times* entitled "Art Auctions on Cruise Ships Lead to Anger Accusations and Lawsuits," by Jori Finkel.  The article detailed sales of low value or worthless "artwork" by Park West at shipboard auctions conducted in international waters, employing representations that the artwork offered by Park West was "museum quality" or "good investments."  The article further detailed the difficulty purchasers encountered in obtaining any satisfaction from Park West on their complaints.  The article stated that whenever there was a settlement with a disgruntled customer, Park West required confidentiality.

196.    After conducting some independent Internet research, Mullen came to the conclusion that he had been defrauded.  Plaintiff did not communicate with Park West, Royal Caribbean or Holland America and thereafter contacted counsel.

### 3.    **Plaintiffs Bruce and Patricia Alleman**

197.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth.

198.    Plaintiffs Bruce and Patricia Alleman (the "Allemans"), husband and wife, are citizens and residents of Waukegan, Illinois.  The Allemans purchased artwork in December 2005 at a Park West shipboard auction while onboard the Royal Caribbean ship *The Enchantment of the Seas.*

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 68
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

199.     While cruising on the *Enchantment of the Seas* in 2005, the Allemans received a cruise ship itinerary each day that listed all of the available activities and/or events that would take place that day.  The daily itinerary provided to the Allemans by Royal Caribbean advertised each of the Park West art auctions and events that would take place throughout the duration of the cruise.  The itineraries received by the Allemans were substantially similar to the ones described herein.

200.     The Allemans arranged for the purchase of their cruise tickets through the internet site, *Expedia.com*, and paid for the tickets using a credit card.  The Allemans paid their credit card bill each month either by electronic funds transfer or by check delivered *via* U.S. Mail.

201.     Plaintiffs Bruce and Patricia Alleman are not sophisticated purchasers of art:

(a)     Plaintiffs purchased two (2) pieces of art after attending several auctions on their Royal Caribbean cruise.  Plaintiffs purchased Appraisals for each of the works purchased from Park West.

(b)     The Allemans attended three (3) auctions on their Royal Caribbean voyage.  At each auction, Park West attempted to loosen up passengers by serving champagne, which the Allemans declined.

(c)     Plaintiffs bid on and purchased the following pieces of art from Park West while on a Royal Caribbean cruise ship using a bid card:

| ARTIST | WORK | HAMMER PRICE | BUYER'S PREMIUM | SHIPPING/ FRAMING | APPRAISAL COST | PURCHASE PRICE | APPRAISAL VALUE FROM PW |
|---|---|---|---|---|---|---|---|
| Ken Shotwell | "London Fog" | $90.00 | $13.50 | $0 | $15 | $148.50 | $360 |
| Ken Shotwell | Eiffel Way | $90.00 | $13.50 | $35 | $35 | $173.50 | $460 |

(d)     All purchases were made while the Royal Caribbean ship cruised in international waters.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 69
Case No. CV9-1178-RSL

1       (e)     The auctioneers represented to the Allemans that the artwork was a "good

2 investment" and that they would appraise for "many times" the price paid at the auction.

3       (f)     The works purchased by Plaintiffs are not a good investment and have

4 little (if any) likelihood of appreciating in value.

5       (g)     Plaintiffs opened an HSBC Park West Collector's Card in December 2005

6 while cruising on the Royal Caribbean *The Enchantment of the Seas*.  The Park West Collector's

7 Card was advertised by Park West to passengers on board the Royal Caribbean cruise ship.  Park

8 West solicited and promoted their Collectors Card by offering free or promotional pieces of art

9 or auction dollar credit to passengers who opened a Park West Collector's Card account (and

10 who purchased artwork using the Collector's Card) while on the Royal Caribbean cruise.

11       (h)     Plaintiffs used their Park West Collectors Card to purchase the artwork

12 they bought from Park West on their Royal Caribbean cruise.  The Allemans then paid their Park

13 West credit card statement each month using an electronic funds transfer or by check delivered

14 *via* U.S. Mail.  The purchase price for both pieces totaled approximately $500.  Plaintiffs paid

15 the hammer price plus a buyer's premium, as well as costs for shipping and handling.

16       (i)     The Allemans received Invoices from Park West for each of the pieces of

17 artwork purchased on their Royal Caribbean cruise that are substantially similar in all material

18 respects to the ones described in this Complaint.  Each Invoice was provided to Plaintiffs while

19 on board the Royal Caribbean ship at the time of purchase.

20       (1)     The Allemans bid on artwork at the auctions, and where they were

21 the successful bidders, they were committed to purchase the artwork before they were presented

22 an Invoice. The bidding paddle had terms and conditions regarding the sale including ALL

23 SALES ARE FINAL. The Allemans met with the auctioneer after the auction to finalize the

24 paperwork for their purchases and received an Invoice for their purchases at that time.

25       (2)     The terms of the Invoices were never discussed before the

26 auctions, including the existence of any shortened statute of limitations provisions. The Allemans

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 70
Case No. CV9-1178-RSL

were never given the opportunity to read anything or to negotiate a change in any terms. The hammer had already gone down on all of their bids and they were the purchasers when the Allemans received their Invoice.

> (j)     Plaintiffs received Certificates of Authenticity for the artwork at their residence in Waukegan, Illinois *via* Federal Express or United Postal Service.  The Certificates of Authenticity were included in the box with each shipment of art.

> (k)     Plaintiffs purchased Appraisals from Park West for both of the pieces they purchased at the auction.  The Appraisals were sent to the Allemans at their residence in Waukegan, Illinois *via* U.S. Mail.  In each of the Appraisals purchased by Plaintiffs, the artwork "appraised" for a price over the hammer price but only because Park West did the appraisal.  The Appraisals were deceptive and designed to validate the auctioneers' misrepresentations at the auctions – that the artwork was a good investment – by "appraising" the works for amounts in excess of the purchase price.  The Appraisals received by the Allemans are identical in all material respects to the Appraisals described in the Complaint.

202.    Each Appraisal Plaintiffs purchased states on its face, "The current Park West Gallery retail replacement price for this work is: [$$$]...."  On the reverse side of each, the "Terms of Appraisal" states:

> Method of Appraisal
> The appraisal represents our opinion of the price a willing buyer would pay a willing seller to acquire the artwork, with neither being under a compulsion to sell or buy.  In making this determination we rely on gallery prices of reputable art galleries and other reliable price data and lists.  We do not rely on third party auction prices or internet prices to arrive at appraised value.

203.    But for Park West's misrepresentations concerning the investment value and appraisal value of the artwork and Royal Caribbean's complicity and facilitation, the Allemans would not have bid on or purchased the artwork.

204.    The Allemans continued to believe in the validity of the Appraisals and that the value of their Park West purchases were as appraised by Park West until 2008.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 71
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

205.     On July 16, 2008, an article appeared in the *New York Times* entitled "Art Auctions on Cruise Ships Lead to Anger Accusations and Lawsuits," by Jori Finkel.  The article detailed sales of low value or worthless "artwork" by Park West at shipboard auctions conducted in international waters, employing representations that the artwork offered by Park West was "museum quality" or "good investments."  The article further detailed the difficulty purchasers encountered in obtaining any satisfaction from Park West on their complaints.  The article stated that whenever there was a settlement with a disgruntled customer, Park West required confidentiality.

206.     Subsequent to the article, the Allemans conducted some independent Internet research and came to the conclusion that they had been defrauded.  Plaintiffs did not communicate with either Park West or Royal Caribbean and thereafter contacted counsel.

**4.     Plaintiffs Russell and Melissa Conley**

207.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

208.     Plaintiffs, Russell and Melissa Conley ("Conleys"), husband and wife, reside in Newburgh, New York. The Conleys purchased artwork from Park West shipboard auctions onboard the Carnival *Sensation* in February 2007.

209.     While cruising on the Carnival cruise ship, the Conleys received a cruise ship itinerary from the Cruise Line each day that listed all of the available activities and/or events that would take place that day. The daily itinerary provided to the Conleys by Carnival advertised each of the Park West art auctions and events that would take place throughout the duration of the cruise. The itineraries received by the Conleys were substantially similar to the ones described herein.

210.     The Conleys arranged for their 2007 Carnival cruise via a telephone call directly with Carnival's reservation department. The tickets were paid for using a credit card and by

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 72
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

paying the credit card company by check delivered via U.S. Mail. The cruise tickets were delivered to the Conleys at their home via U.S. Mail.

211.   The Conleys are not sophisticated purchasers of art:

(a)   Plaintiffs purchased a total of 5 pieces of art after attending one auction on their Carnival cruise. Plaintiffs purchased Appraisals for all of the artwork purchased from Park West.

(b)   At the auction, Park West attempted to loosen up passengers by serving champagne.

(c)   Plaintiffs purchased the following pieces of art from Park West while on their Carnival cruise:

| ARTIST | WORK | HAMMER PRICE | BUYER'S PREMIUM | SHIPPING/ FRAMING | APPRAISAL COST | PURCHASE PRICE | APPRAISAL VALUE FROM PW |
|--------|------|-------------|-----------------|-------------------|----------------|----------------|-------------------------|
| Slava Brodinsky | Winding Down | $530.00 | $79.50 | $60.55 | $15.00 | $685.05 | $890.00 |
| Salvador Dali | Divine Comedy – Purgatory 22 | $5,950.00 | $892.50 | $112.98 | $15.00 | $6,970.48 | $11,600.00 |
| Erte | Selection of a Heart | $2,675.00 | $401.25 | $85.21 | $15.00 | $3,176.46 | $6,850.00 |
| Joan Miro | The Perseides III | $15,100.00 | $2,265.00 | $236.58 | $35.00 | $17,636.58 | $26,500.00 |
| Rembrandt van Rijn | Bust of A Man Wearing a High… | $2,600.00 | $390.00 | $69.50 | $15.00 | $3,074.50 | $4,100.00 |

(d)   All purchases were made while the Carnival ship was cruising in international waters.

(e)   The auctioneers represented to the Conleys that the artwork was a "good investment" and that it would appraise for "many times" the price paid at the auction.

(f)   The works purchased by Plaintiffs are not a good investment and have little (if any) likelihood of appreciating in value.

(g)   Plaintiffs each opened an HSBC Park West Collectors Card in 2007 while cruising on the Carnival ship. The Park West Collectors Card was advertised by Park West to passengers onboard the Carnival cruise ship. Park West solicited and promoted their Collectors

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 73
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1   Card by offering free or promotional pieces of art or auction dollar credit to passengers to opened

2   a Park West Collectors Card account (and who purchased artwork using the Collectors Card)

3   while on the Carnival cruise.

4         (h)    Plaintiffs used their Park West Collectors Cards to purchase the artwork

5   they bought from Park West on their Carnival cruise. The Conleys then paid their credit card  bill

6   each month by sending a check via U.S. Mail. The purchase price for all of the artwork bought

7   from Park West while on the Carnival cruise ship totaled approximately $30,160.57. Plaintiffs

8   paid the hammer price plus a buyer's premium, as well as costs for shipping and handling.

9         (i)    The Conleys received Invoices from Park West for each of the pieces of

10   artwork purchased on their Carnival cruise that are substantially similar in all material respects to

11   the ones described in this Complaint. Each Invoice was provided to Plaintiffs while onboard the

12   Carnival ship at the time of purchase.

13         (1)    The Conleys purchased all of their artwork after the auction at the

14   private sale. The Conleys were not told about any special terms and conditions in the Invoices.

15         (2)    The terms of the Invoices were never discussed before the auction

16   or at the private sale, including the existence of any shortened statute of limitations provisions.

17   The Conleys were never given the opportunity to read anything or to negotiate a change in any

18   terms. Plaintiffs had already committed to purchasing the artwork and "ALL SALES WERE

19   FINAL" when the Conleys received their Invoices.

20         (j)    Plaintiffs received Certificates of Authenticity for the artwork at their

21   residence in New York via U.S. Mail. The Certificates of Authenticity were packaged along with

22   their corresponding Appraisals. Plaintiffs' Certificates of Authenticity are substantially similar to

23   the ones described herein.

24         (k)    Plaintiffs purchased Appraisals from Park West for all of the pieces they

25   purchased from Park West. The Appraisals were sent to the Conleys via U.S. Mail at their New

26   York residence. In each of the Appraisals purchased from Park West, the artwork "appraised" for

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 74
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

a price over the hammer price but only because Park West did the appraisal. The Appraisals were deceptive and designed to validate the auctioneer's misrepresentations at the auctions – that the artwork was a good investment – by "appraising" the works for amounts in excess of the purchase price. The Appraisals received by the Conleys are identical in all material respects to the Appraisals described herein.

212.    The Appraisals purchased state on their face, "[t]he current gallery retail replacement price for this work, including its frame, is:  [$$$]…." On the reverse side of each, the "Terms of Appraisal" states:

> Method of Appraisal
> This appraisal represents our opinion of the price a willing buyer
> would pay a willing seller to acquire the artwork, with neither
> being under a compulsion to sell or buy.  In making this
> determination we rely on gallery prices of reputable art galleries
> and other reliable price data and lists.  We do not rely on third
> party auction prices or internet prices to arrive at appraised value.

213.    But for Park West's misrepresentations and Carnival's complicity and facilitation about the investment value and the Appraisal value of the artwork, the Conleys would not have bid on or purchased the artwork.

214.    The Conleys continued to believe in the validity of the Appraisals and that the value of their Park West purchase were as appraised by Park West until 2008.

215.    On July 16, 2008, an article appeared in the *New York Times* entitled "Art Auctions on Cruise Ships Lead to Anger Accusations and Lawsuits," by Jori Finkel.  The article detailed sales of low value or worthless "artwork" by Park West at shipboard auctions conducted in international waters, employing representations that the artwork offered by Park West was "museum quality" or "good investments."  The article further detailed the difficulty purchasers encountered in obtaining any satisfaction from Park West on their complaints.  The article stated that whenever there was a settlement with a disgruntled customer, Park West required confidentiality.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 75
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

216.    In May of 2008, the Conleys' realtor's husband alerted them that there had been a lot of news at the time regarding problems with the authenticity of works by Salvador Dali. Shortly thereafter, Melissa Conley became interested in selling the Miro piece they had purchased from Park West and the Conleys started researching their purchases online. The Conleys came across the Fine Art Registry website and read about Park West's conduct alleged in this Complaint and came to the conclusion that they had been defrauded.

## V.    FRAUDULENT CONCEALMENT; EQUITABLE TOLLING AND EQUITABLE ESTOPPEL

217.    Any applicable statutes of limitations have been tolled by Defendants' illegal practices.  Defendants have fraudulently concealed from Plaintiffs and the Class the truth about the unlawful practices described herein, thereby tolling the running of applicable statutes of limitation.

218.    Park West with the complicity of the Cruise Lines successfully concealed from Plaintiffs and the Class facts that would be sufficient to excite suspicion regarding the claims against them due to Park West's deception, conspiracy and continued operations.

219.    The information that Plaintiffs and the Class required to discover their claims and to prosecute this Complaint is under Defendants' exclusive control.  Park West is not a publicly held corporation, limiting the information available to Plaintiffs and the Class.

220.    Plaintiffs and the Class could not have acquired knowledge sufficient to initiate this action through their exercise of reasonable diligence. Defendants are estopped from asserting any statute of limitations as a defense to the claims in this Complaint by virtue of Defendants' acts of fraudulent concealment.

221.    Any reasonable plaintiff exercising reasonable judgment would not have known of his/her claim within the limitations period in the Park West Invoice or within the statute of limitations.  As set forth above, Park West hid the complaints by individual customers by resorting to confidentiality agreements.  In addition, Park West responded to all challengers,

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 76
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

including the *New York Times* article by maintaining that it had never sold an unauthentic work of art.  In fact, Park West continues to maintain on its website that it had never sold unauthentic art.  Park West also (falsely) stated on its website that it was the victim of a malicious cyber-slander campaign by Teresa Franks and the Fine Arts Registry.

222.    Park West bullied and frightened potential claimants by threatening lawsuits with the customer including payment of Park West's attorneys' fees to intimidate claimants and then seemed to make good on the threat with the expensive lawsuit in Michigan against Theresa Franks and the Fine Arts Registry, is still ongoing.

223.    Contemporaneously with its acts of concealment, Park West continued the same deceptive conduct over and over again at auction after auction creating the reasonably (albeit incorrect) inference in Plaintiffs and the Class that Park West had committed no illegal acts and that the Cruise Lines supported Park West's position of no illegality.

224.    The Cruise Lines continued to grant Park West access to their passengers and to allow Park West to piggyback on the Cruise Lines' reputations (until 2010) creating the reasonable inference that the Cruise Lines did not believe Park West had committed any illegal acts.

225.    No reasonable Plaintiff or Class member would have known about his/her claims during any limitations period under the circumstances alleged in this Complaint.  Park West continued to operate in the manner described in this Complaint **after** the *New York Times* article of June 2008 and even after the filing of the *Blackman* complaint.

226.    Plaintiffs and the Class were not effectively alerted to the existence and scope of this fraud and were not on notice of their potential claims until shortly prior to the filing of the initial Complaint in *Blackman, et al. v. Park West Galleries, et al.*, No. C08-1310 RSL (W.D. Wash.).

227.    The applicable statutes of limitations for Plaintiffs' claims against Defendants are tolled by Defendants' fraudulent concealment of their actions as alleged herein.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 77
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1

2

3

4

5

## VI.    CLASS ACTION ALLEGATIONS

6      228.    Plaintiffs[13] bring all claims herein as Class claims pursuant to Rule 23 of the

7  Federal Rules of Civil Procedure.  The requirements of subparts 23(a) and 23(b)(2), and (b)(3)

8  are met with respect to the Class defined below.

9      **A.    Class Definition**

10     229.    Plaintiffs bring this action individually and on behalf of the following class of

11  similarly situated persons (the "Class"), including subclasses, of which Plaintiffs are members:

12           All Persons who purchased artwork and purchased or received an
             Appraisal from Park West (as defined in this Complaint) or from
13           any entity owned, controlled, or operated or affiliated with Park
             West during the applicable statute of limitations period(s).
14

15  All Plaintiffs are members of this Class.

16           *a.    Unauthentic Artwork Subclass*

17           Persons in the Class defined above who purchased unauthentic
             artwork.

18  Plaintiffs Bohm, Lee, Mullen, and Conleys are members of this Subclass.

19           *b.    Land Artwork Subclass*

20           Persons in the Class defined above who purchased artwork and
21           purchased or received an Appraisal from Park West (as defined in
             this Complaint) or from any entity owned, controlled, or operated
22           or affiliated with Park West, land auction or gallery within the
             United States during the applicable statute of limitations period(s).
23

    Plaintiffs Bohm and Lee are members of this Subclass.

24

25

26     [13] The term "Plaintiffs" in section IV does not include Joseph Bohm, the Individual Plaintiff.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 78
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    Excluded from the Class or Sub-Class (hereinafter together, the "Class") are Defendants

2    and any of their officers, directors or employees, the presiding judge, and any member of their

3    immediate families.  Plaintiffs hereby reserve their right to amend the above Class definition

4    based on discovery and the proofs at trial.

5        **B.    Numerosity**

6        230.    The Class is so numerous that joinder of all members is impracticable.  While the

7    exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained

8    through appropriate discovery, Plaintiffs believe that there are at least one hundred persons in the

9    Class.

10       231.    The precise number of Class members and their addresses are unknown to the

11   Plaintiff, but can be obtained from Defendants' records.  For example, Park West employs a

12   Director of Shipboard Operations at its Southfield, Michigan headquarters who declared under

13   penalty of perjury in the *Bouverat* litigation (cited above) that Park West prepares an "End of

14   Cruise Report" for each cruise on which it conducts auctions, which records the trip history for

15   each art auction held onboard any cruise, as well as sales to Class members during the cruise.

16   Park West also maintains copies of all Invoices and Appraisals for purchases at shipboard

17   auctions that will identify members of the Class.  The Cruise Lines further maintain ships'

18   manifests of all passengers that would identify members of the Class. Scaglione testified that

19   PWG maintains a file of Invoices for at least 7 years.

20       **C.    Commonality**

21       232.    There are questions of law and fact common to the Class, including at least the

22   following:

23           (a)    whether Defendants fraudulently misrepresented the artwork it sold to

24   Plaintiffs and the Class;

25           (b)    whether Defendants fraudulently misrepresented the Appraisals sold to

26   Plaintiffs and the Class;

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 79
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1         (c)      whether Scaglione and Park West concealed or omitted to disclose

2  material information from Plaintiffs and the Class regarding the artwork and Appraisals sold to

3  Plaintiffs and the Class;

4         (d)      whether the acts and omissions of the Defendants alleged herein constitute

5  violations of RICO;

6         (e)      whether the Cruise Lines and/or Defendants conspired with Park West to

7  operate the scheme alleged herein in violation of RICO, 18 U.S.C. § 1962(d);

8         (f)      whether Defendants used the mails and wires to further their scheme and

9  conspiracy in violation of RICO, 18 U.S.C. § 1962(d);

10        (g)      whether the Gallery Enterprise constitutes an association-in-fact enterprise

11  under RICO, 18 U.S.C. § 1961(4);

12        (h)      whether the Gallery/Holland Enterprise constitutes an association-in-fact

13  enterprise under RICO, 18 U.S.C. § 1961(4);

14        (i)      whether the Gallery/Royal Caribbean Enterprise constitutes an

15  association-in-fact enterprise under RICO, 18 U.S.C. § 1961(4);

16        (j)      whether the Gallery/Carnival Enterprise constitutes an association-in-fact

17  enterprise under RICO, 18 U.S.C. § 1961(4);

18        (k)      whether the Gallery/Celebrity Enterprise constitutes an association-in-fact

19  enterprise under RICO, 18 U.S.C. § 1961(4);

20        (l)      whether the acts and omissions of the Defendants alleged herein constitute

21  violations of admiralty common law fraud;

22        (m)      whether the acts and omissions of FASI, Vista, PWG FL and Scaglione

23  alleged herein constitute violations of the admiralty common law aiding and abetting fraud;

24        (n)      whether Defendants' acts and omissions alleged herein constitute unjust

25  enrichment;

26

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 80
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

(o)     whether the acts and omissions of the Defendants alleged herein constitute agency and civil conspiracy;

(p)     whether Plaintiffs and the members of the Class have sustained damages and, if so, what is the proper measure of those damages;

(q)     whether Plaintiffs and the members of the Class are entitled to the relief sought, including injunctive relief and attorneys' fees; and

(r)     whether the acts and omissions of Defendants alleged herein constitute fraudulent concealment or whether Defendants breached an affirmative duty to disclose a material fact.

### D.     Typicality

233.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs have the same interests in this matter as all other members of the Class, and their claims are substantially identical to and typical of the claims of all members of the Class.

### E.     Adequacy

234.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained the undersigned counsel who is competent and experienced in the prosecution of complex class action litigation.  The interests of the Plaintiffs are aligned with, and not antagonistic to, those of the Class.

### F.     The Prerequisites to Maintaining a Class Action for Injunctive Relief Are Readily Apparent

235.    The prerequisites to maintaining a class action for injunctive relief and equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist:

a.      If injunctive relief is not granted, great harm and irreparable injury to Plaintiffs and the members of the Class will continue; and

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 81
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1          b.      Plaintiffs and the members of the Class have no adequate remedy at law

2   for the injuries which are threatened to recur, in that, absent action from this Court, Defendants

3   will continue to violate RICO and cause damage.

4          236.    The prosecution of separate actions by members of the Class would create a risk

5   of establishing incompatible standards of conduct for Defendants – for example, one court might

6   decide that the challenged actions are illegal and enjoin them, while another court might decide

7   that those same actions are not illegal.  Individual actions may, as a practical matter, be

8   dispositive of the interests of the Class.

9          237.    Defendants' actions are generally applicable to the Class as a whole, and Plaintiff

10   seeks, *inter alia*, equitable remedies with respect to the Class as a whole.

11          238.    Defendants' alleged uniform scheme and common course of conduct make

12   declaratory relief with respect to the Class as a whole appropriate.

13          **G.      Common Questions Predominate, and the Class Action Device Is Superior**

14          239.    The common questions of law and fact enumerated above predominate over

15   questions affecting only individual members of the Class, and a class action is the superior

16   method for fair and efficient adjudication of the controversy pursuant to Fed. R. Civ. P. 23(b)(3).

17   The likelihood that individual members of the Class will prosecute separate actions is remote due

18   to the extensive time and considerable expense necessary to conduct such litigation, especially in

19   view of the relatively modest amount of monetary, injunctive and equitable relief at issue for

20   each individual Class member.  Plaintiffs' counsel, highly experienced in class actions, foresee

21   little difficulty in the management of this case as a class action.  This action will be prosecuted in

22   a fashion to ensure the Court's able management of this case as a class action on behalf of the

23   Class.

24

25

26

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 82
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

## VII.   CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF 18 U.S.C. §§ 1962(c) AND (d) (AGAINST ALL DEFENDANTS)**

240.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

241.   Plaintiffs and each Class member and each Defendant is a "person," as that term is defined in 18 U.S.C. § 1961(3).

242.   At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity, and engaged in a conspiracy in violation of 1962(d).

**A.     The Enterprises**

**1.     The Gallery Enterprise**

243.   The RICO "enterprise" is an association-in-fact entitled the "Gallery Enterprise" consisting of:  (1) Park West Galleries, Inc.; (2) PWG Florida, Inc.; (3) Vista Art, LLC; (4) Fine Art Sales, Inc.; and (5) Scaglione.

244.   The Gallery Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of financial remuneration through selling worthless or overvalued art through the pattern of racketeering activity alleged herein.

245.   The Gallery Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

246.   While all Defendants participate in and are members and part of the Gallery Enterprise, they also have an existence separate and distinct from the enterprise.

247.   In order to successfully steer as many consumers as possible into buying worthless or overvalued art, Defendants need a system that allows them to effectively promote

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 83
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

the sale of Park West artwork.  The Gallery Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme.  Furthermore, the participation by the Park West affiliates in the Gallery Enterprise allows the Gallery Enterprise to function more effectively, given that many of the functions provided by these entities, such as Appraisals and Certificates of Authenticity, would normally be conducted by independent entities.  Park West's affiliates, such as Fine Art Sales, participation in the enterprise allows the normal checks and balances within art appraisal and authentication process to be eliminated, permitting Defendants to advance their scheme and conceal the fraudulent activity they have been engaging in.

248.    The Gallery Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

249.    The Gallery Enterprise has a systemic linkage because their long standing relationships are contractual relationships, financial ties, and continuing coordination of activities among the Defendants.  There is a common communication network by which the Defendants shared and continued to share information on a regular basis.  Typically this communication occurred by use of the wires and mails in which Defendants discussed and agreed on the scheme of creating, selling, promoting, appraising, and authenticating artwork that was falsely represented as a good investment, authentic and/or overvalued.  Defendants functioned as a continuing unit for the purposes of implementing this scheme.

250.    The material decisions guiding the operation of this Gallery Enterprise – including but not limited to: decisions concerning the form and content of campaigns, advertising and other vehicles used by any Defendant to promote, sell, appraise, and authenticate the other's products and services pursuant to their agreement (and including the sale of Park West artwork that is falsely represented as a good investment, as authentic or having authorship that it does not in fact have) – are made by Defendants jointly.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 84
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

251.    Defendants' racketeering activities as described in this Complaint amounted to a common course of conduct with the Gallery Enterprise, intended to deceive and harm Plaintiffs and the Class.  Each racketeering activity alleged was related, had similar purposes, involved the same or similar participants and had similar results affecting similar victims, including Plaintiffs and the Class.  Defendants' racketeering activities were part of their ongoing business and constitute a continuing threat to the property of Plaintiffs and the Class.

252.    At all relevant times, all Defendants were aware of Park West's conduct; were knowing and willing participants in that conduct by promoting, selling, appraising, and authenticating worthless or overvalued artwork to Plaintiffs and others; and reaped profits from that conduct.

(a)     The internet and news sources now abound with first-hand complaints about Park West and the Gallery Enterprise.  In addition, purchasers of Park West artwork have filed complaints with the courts and Attorneys General's offices throughout the United States. Defendants have ignored the complaints, rebuffed their customers and continued to participate in the scheme.

(b)     Plaintiffs and the Class did not discover that the artwork they purchased was worthless or overvalued until after they purchased the artwork and the charges had been billed.  Because Scaglione's, Park West's and Fine Art Sales' Appraisals and Certificates of Authenticity are misleading, purchasers might not discover that the artwork is worthless or overpriced until much later.  If and when they did discover the fraud, they were prohibited from seeking a full refund of the charges. Thus, Plaintiffs and the Class have not been placed in the position they were in before Defendants sold them worthless or overvalued artwork, Appraisals and Certificates of Authenticity.

253.    The impact of this conduct is still in place, *i.e.*, Plaintiffs and the Class still have worthless and overvalued Park West artwork.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 85
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

254.    The foregoing evidences that the Defendants are willing participants in the Gallery Enterprise; had a common purpose and interest in the establishment and operation of the foregoing scheme; and agreed to a structure wherein Park West, PWG Florida, Vista, Fine Art Sales and Scaglione would promote, sell, appraise, and authenticate Plaintiffs' purchases of worthless and overvalued artwork.  This structure was the basis on which the Gallery Enterprise operated.

255.    That common purpose and existence of the scheme is further evidenced by the fact that all of the defendants in the Gallery Enterprise are using the same lawyers so they can coordinate and further their common scheme.  Indeed after the litigation was initially filed, Defendants continued the scheme and none of the Gallery Defendants investigated the truth of the allegations in the various complaints but continued to adopt their party line advanced by Park West.

### 2.    Gallery/HAL Enterprise

256.    The RICO "enterprise" is an association-in-fact entitled the "Gallery/HAL Enterprise" consisting of:  (1) Park West Galleries, Inc.; (2) PWG Florida, Inc.; (3) Vista Art, LLC; (4) Fine Art Sales, Inc; (5) Holland America Line and Holland America Line-USA; (together "HAL"); and (6) Scaglione.

257.    The Gallery/HAL Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of financial remuneration through selling worthless or overvalued art through the pattern of racketeering activity alleged herein.

258.    The Gallery/HAL Enterprise has been in existence for ten years and continues in existence to the present.

259.    For at least the past ten years Park West has had a contractual relationship with HAL which provides Park West with the exclusive right to conduct art auctions on cruises.  Park West business records include an "End of Cruise Report" created and maintained by Park West

for each cruise on which an auction was conducted detailing:  the ship's itinerary, date and shipboard venue of the auction, start and stop time of the auction, attendance, revenue from sales, including buyer's premium, appraisals sold and customer's method of payment, including payment on the ship's bill.[14]

260.    The Gallery/HAL Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

261.    While Defendants and HAL participate in and are members and part of the Gallery/HAL Enterprise, they also have an existence separate and distinct from the enterprise.

262.    In order to successfully steer as many consumers as possible into buying worthless or overvalued art, Defendants need a system that allows them to effectively promote the sale of Park West artwork.  The Gallery/HAL Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme.

263.    ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

---

[14] The ship's bill will include any items purchased by the cruiser that were not included in the price of the ticket.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 87
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

264.    The Gallery/HAL Enterprise has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities among the Defendants and

HAL.  There is a common communication network by which the Defendants shared and

continued to share information with HAL on a regular basis.  Typically this communication

occurred by use of the wires and mails in which the Defendants and HAL discuss and agree on

the scheme of selling and promoting artwork that is falsely represented as authentic and/or

overvalued.  The Gallery/HAL Enterprise members functioned as a continuing unit for the

purposes of implementing this scheme.

265.    The material decisions guiding the operation of this Gallery/ HAL Enterprise –

including but not limited to, decisions concerning the form and content of campaigns, advertising

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 88
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1   and other vehicles used by any Defendant to promote the other's products and services pursuant

2   to their agreement (and including the sale of Park West artwork that is falsely represented as a

3   good investment, authentic or having authorship that it does not in fact have) – are made by

4   Defendants jointly.

5          266.    Defendants' racketeering activities as described in this Complaint amounted to a

6   common course of conduct with the Gallery/HAL Enterprise, intended to deceive and harm

7   Plaintiffs and the Class.  Each racketeering activity alleged was related, had similar purposes,

8   involved the same or similar participants and methods of commission, and had similar results

9   affecting similar victims, including Plaintiffs and the Class.  Defendants' racketeering activities

10  were part of their ongoing business and constitute a continuing threat to the property of Plaintiffs

11  and the Class.

12         267.    The impacts of this conduct are still in place, *i.e.*, Plaintiffs and the Class still

13  have worthless and overvalued Park West artwork.

14         268.    The foregoing evidences that all Defendants are willing participants in the

15  Gallery/HAL Enterprise; had a common purpose and interest in the establishment and operations

16  of the foregoing scheme; and agreed to a structure wherein the HAL and Park West would

17  promote, sell, and finance Plaintiffs' and Class members' purchases of worthless and overvalued

18  artwork.  This structure was the basis on which the Gallery/HAL Enterprise operated.

19         **3. Gallery/RCCL Enterprise**

20         269.    The RICO "enterprise" is an association-in-fact entitled the "Gallery/RCCL

21  Enterprise" consisting of:  (1) Park West Galleries, Inc.; (2) PWG Florida, Inc.; (3) Vista Art,

22  LLC; (4) Fine Art Sales, Inc; (5) Royal Caribbean Cruises Ltd; and (6) Scaglione.

23         270.    The Gallery/RCCL Enterprise is an ongoing and continuing business organization

24  consisting of both corporations and individuals that are and have been associated for the common

25  or shared purposes of financial remuneration through selling worthless or overvalued art through

26  the pattern of racketeering activity alleged herein.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 89
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

271.    The Gallery/RCCL Enterprise has been in existence for ten years and continues in existence to the present.

272.    For at least the past ten years Park West has had a contractual relationship with RCCL which provides Park West with the exclusive right to conduct art auctions on cruises. Park West business records include an "End of Cruise Report" created and maintained by Park West for each cruise on which an auction was conducted detailing:  the ship's itinerary, date and shipboard venue of the auction, start and stop time of the auction, attendance, revenue from sales, including buyer's premium, appraisals sold and customer's method of payment, including payment on the ship's bill.

273.    The Gallery/RCCL Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

274.    While Defendants and RCCL participate in and are members and part of the Gallery/RCCL Enterprise, they also have an existence separate and distinct from the enterprise.

275.    In order to successfully steer as many consumers as possible into buying worthless or overvalued art, Defendants need a system that allows them to effectively promote the sale of Park West artwork.  The Gallery/RCCL Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme.

276.    ██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 90
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1 ██████████████████████████████████████████████████
2 ██████████████████████████████████████████████████
3 ████████████████████████████████████████████████████
4 ████████████████████████████████████████████████
5 ████████████████████████████████████████████████
6 ████████████████████████████████████████████████████
7 ██████████████████████████████████

277.    The Gallery/RCCL Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities among the Defendants and RCCL.  There is a common communication network by which the Defendants shared and continued to share information with RCCL on a regular basis.  Typically this communication occurred by use of the wires and mails in which the Defendants and RCCL discuss and agree on the scheme of selling and promoting artwork that is falsely represented as authentic and/or overvalued.  The Gallery/RCCL Enterprise members functioned as a continuing unit for the purposes of implementing this scheme.

278.    The material decisions guiding the operation of this Gallery/RCCL Enterprise – including but not limited to: decisions concerning the form and content of campaigns, advertising and other vehicles used by any Defendant to promote the other's products and services pursuant to their agreement (and including the sale of Park West artwork that is falsely represented as a good investment, authentic or having authorship that it does not in fact have) – are made by Defendants jointly.

279.    Defendants' racketeering activities as described in this Complaint amounted to a common course of conduct with the Gallery/RCCL Enterprise, intended to deceive and harm Plaintiffs and the Class.  Each racketeering activity alleged was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.  Defendants' racketeering activities

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 91
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    were part of their ongoing business and constitute a continuing threat to the property of Plaintiffs

2    and the Class.

3         280.    The impacts of this conduct are still in place, *i.e.*, Plaintiffs and the Class still

4    have worthless and overvalued Park West artwork.

5         281.    The foregoing evidences that all Defendants are willing participants in the

6    Gallery/RCCL Enterprise; had a common purpose and interest in the establishment and

7    operations of the foregoing scheme; and agreed to a structure wherein the RCCL and Park West

8    would promote, sell, and finance Plaintiffs' and Class members' purchases of worthless and

9    overvalued artwork.  This structure was the basis on which the Gallery/RCCL Enterprise

10   operated.

11        **4.    The Gallery/Carnival Enterprise**

12        282.    The RICO "enterprise" is an association-in-fact entitled the "Gallery/Carnival

13   Enterprise" consisting of:  (1) Park West Galleries, Inc.; (2) PWG Florida, Inc.; (3) Vista Art,

14   LLC; (4) Fine Art Sales, Inc; (5) Carnival Corporation and Carnival plc (together, "Carnival");

15   and (6) Scaglione.

16        283.    The Gallery/Carnival Enterprise is an ongoing and continuing business

17   organization consisting of both corporations and individuals that are and have been associated

18   for the common or shared purposes of financial remuneration through selling worthless or

19   overvalued art through the pattern of racketeering activity alleged herein.

20        284.    The Gallery/Carnival Enterprise has been in existence for ten years and continues

21   in existence to the present.

22        285.    For at least the past ten years Park West has had a contractual relationship with

23   Carnival which provides Park West with the exclusive right to conduct art auctions on cruises.

24   Park West business records include an "End of Cruise Report" created and maintained by Park

25   West for each cruise on which an auction was conducted detailing:  the ship's itinerary, date and

26   shipboard venue of the auction, start and stop time of the auction, attendance, revenue from

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 92
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    sales, including buyer's premium, appraisals sold and customer's method of payment, including

2    payment on the ship's bill.

3        286.    The Gallery/Carnival Enterprise is an ongoing organization that engages in, and

4    whose activities affect, interstate commerce.

5        287.    While Defendants and Carnival participate in and are members and part of the

6    Gallery/Carnival Enterprise, they also have an existence separate and distinct from the enterprise.

7        288.    In order to successfully steer as many consumers as possible into buying

8    worthless or overvalued art, Defendants need a system that allows them to effectively promote

9    the sale of Park West artwork.  The Gallery/Carnival Enterprise provides Defendants with that

10   system and ability, and their control of and participation in it is necessary for the successful

11   operation of their scheme.

12       289.    ███████████████████████████████

13   ████████████████████████████████

14   █████████████████████████████████

15   █████████████████████████████████

16   █████████████████████████████████

17   ████████████████████████████████

18   ████████████████████████████████

19   █████████████████████████████████

20   ██████████████████████████████████

21   ██████████████████████████████

22   █████████████████████████████

23   █████████████████████████████████

24   ██████████████████████████████████

25   █████████████████████████████████

26   █████████████████████████████████

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 93
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1

2
3
4
5
6
7
8
9
10
11

12    290.    The Gallery/Carnival Enterprise has a systemic linkage because there are

13  contractual relationships, financial ties, and continuing coordination of activities among the

14  Defendants and Carnival.  There is a common communication network by which the Defendants

15  shared and continued to share information with Carnival on a regular basis.  Typically this

16  communication occurred by use of the wires and mails in which the Defendants and Carnival

17  discuss and agree on the scheme of selling and promoting artwork that is falsely represented as

18  authentic and/or overvalued.  The Gallery/Carnival Enterprise members functioned as a

19  continuing unit for the purposes of implementing this scheme.

20    291.    The material decisions guiding the operation of this Gallery/Carnival Enterprise –

21  including but not limited to: decisions concerning the form and content of campaigns, advertising

22  and other vehicles used by any Defendant to promote the other's products and services pursuant

23  to their agreement (and including the sale of Park West artwork that is falsely represented as a

24  good investment, authentic or having authorship that it does not in fact have) – are made by

25  Defendants jointly.

26

THIRD AMENDED AND CONSOLIDATED CLASS ACTION                CHIMICLES & TIKELLIS LLP
COMPLAINT - 94                                                                          361 W. Lancaster Avenue
Case No. CV9-1178-RSL                                                             Haverford, PA 19041
                                                                                              Telephone: (610) 642-8500
                                                                                              Facsimile: (610) 649-3633

292.     Defendants' racketeering activities as described in this Complaint amounted to a common course of conduct with the Gallery/Carnival Enterprise, intended to deceive and harm Plaintiffs and the Class.  Each racketeering activity alleged was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.  Defendants' racketeering activities were part of their ongoing business and constitute a continuing threat to the property of Plaintiffs and the Class.

293.     The impacts of this conduct are still in place, *i.e.*, Plaintiffs and the Class still have worthless and overvalued Park West artwork.

294.     The foregoing evidences that all Defendants are willing participants in the Gallery/Carnival Enterprise; had a common purpose and interest in the establishment and operations of the foregoing scheme; and agreed to a structure wherein the Carnival and Park West would promote, sell, and finance Plaintiffs' and Class members' purchases of worthless and overvalued artwork.  This structure was the basis on which the Gallery/Carnival Enterprise operated.

295.     That common purpose and existence of the scheme is further evidenced by the fact that all of the defendants in the Gallery/Carnival Enterprise are using the same lawyers so they can coordinate and further their common scheme.  Indeed after the litigation was initially filed, Defendants continued the scheme and Carnival did not investigate the truth of the allegations in the various complaints but continued to adopt their party line advanced by Park West.

### 5.  Gallery/Celebrity Enterprise

296.     The RICO "enterprise" is an association-in-fact entitled the "Gallery/Celebrity Enterprise" consisting of:  (1) Park West Galleries, Inc.; (2) PWG Florida, Inc.; (3) Vista Art, LLC; (4) Fine Art Sales, Inc; (5) Celebrity Cruises; and (6) Scaglione.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 95
Case No. CV9-1178-RSL

297.    The Gallery/Celebrity Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of financial remuneration through selling worthless or overvalued art through the pattern of racketeering activity alleged herein.

298.    The Gallery/Celebrity Enterprise has been in existence for ten years and continues in existence to the present.

299.    For at least the past ten years Park West has had a contractual relationship with Celebrity which provides Park West with the exclusive right to conduct art auctions on cruises. Park West business records include an "End of Cruise Report" created and maintained by Park West for each cruise on which an auction was conducted detailing:  the ship's itinerary, date and shipboard venue of the auction, start and stop time of the auction, attendance, revenue from sales, including buyer's premium, appraisals sold and customer's method of payment, including payment on the ship's bill.

300.    The Gallery/Celebrity Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

301.    While Defendants and Celebrity participate in and are members and part of the Gallery/Celebrity Enterprise, they also have an existence separate and distinct from the enterprise.

302.    In order to successfully steer as many consumers as possible into buying worthless or overvalued art, Defendants need a system that allows them to effectively promote the sale of Park West artwork.  The Gallery/Celebrity Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme.

303.    ███████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 96
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

304.    The Gallery/Celebrity Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities among the Defendants and Celebrity.  There is a common communication network by which the Defendants shared and continued to share information with Celebrity on a regular basis.  Typically this communication occurred by use of the wires and mails in which the Defendants and Celebrity discuss and agree on the scheme of selling and promoting artwork that is falsely represented as a good investment, authentic and/or overvalued.  The Gallery/Celebrity Enterprise members functioned as a continuing unit for the purposes of implementing this scheme.

305.    The material decisions guiding the operation of this Gallery/Celebrity Enterprise – including but not limited to, decisions concerning the form and content of campaigns, advertising and other vehicles used by any Defendant to promote the other's products and services pursuant to their agreement (and including the sale of Park West artwork that is falsely represented as a

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1   good investment, authentic or having authorship that it does not in fact have) – are made by

2   Defendants jointly.

3       306.    Defendants' racketeering activities as described in this Complaint amounted to a

4   common course of conduct with the Gallery/Celebrity Enterprise, intended to deceive and harm

5   Plaintiffs and the Class.  Each racketeering activity alleged was related, had similar purposes,

6   involved the same or similar participants and methods of commission, and had similar results

7   affecting similar victims, including Plaintiffs and the Class.  Defendants' racketeering activities

8   were part of their ongoing business and constitute a continuing threat to the property of Plaintiffs

9   and the Class.

10      307.    The impacts of this conduct are still in place, *i.e.*, Plaintiffs and the Class still

11  have worthless and overvalued Park West artwork. The foregoing evidences that all Defendants

12  are willing participants in the Gallery/Celebrity Enterprise; had a common purpose and interest

13  in the establishment and operations of the foregoing scheme; and agreed to a structure wherein

14  the Celebrity and Park West would promote, sell, and finance Plaintiffs' and Class members'

15  purchases of worthless and overvalued artwork.  This structure was the basis on which the

16  Gallery/Celebrity Enterprise operated.

17      308.    That common purpose and existence of the scheme is further evidenced by the

18  fact that all of the defendants in the Gallery/Celebrity Enterprise are using the same lawyers so

19  they can coordinate and further their common scheme.  Indeed after the litigation was initially

20  filed, Defendants continued the scheme and Celebrity did not investigate the truth of the

21  allegations in the various complaints but continued to adopt their party line advanced by Park

22  West.

23      **B.**    **The Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

24      309.    The Enterprises engaged in and affected interstate commerce because they

25  engaged in the following activities across state boundaries:  selling, financing, and shipping

26  worthless or overvalued artwork and misleading Certificates of Authenticity and Appraisals.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 98
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

310.     Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. Mails and interstate wire facilities. For example, as alleged herein, Park West shipped artwork and Certificates of Authenticity to Plaintiffs' residences in the United States.  Plaintiffs purchased tickets for cruise line voyages using U.S. Mail or interstate wire facilities.  Plaintiffs made payments for artwork *via* the mail and use of the interstate wires.  Plaintiffs received Appraisals *via* U.S. Mail.  These communications were made by interstate wires and were part of implementation of the scheme in that the disputed artwork, Appraisals and Certificates of Authenticity were sent by mail after the consumer agreed to purchase the artwork aboard Cruise Line cruises or at on-land auction.

311.     In furtherance of the scheme each Plaintiff received communications from Defendants, including but not limited to:

Bohm and Lee

(a)     Bohm and Lee received ship itineraries from Celebrity in their staterooms *via* intership mail communicating the Park West events taking place while they were onboard Celebrity in 2002.  In September 2004, Bohm and Lee received ship itineraries from Carnival in their stateroom communicating the Park West events taking place while they were onboard the *Victory*.

(b)     Bohm and Lee both spoke with the Park West auctioneers on board the Celebrity ship in 2002.  Bohm and Lee both spoke with the Park West auctioneers on board the Carnival *Liberty* in September 2004.  Lee received Invoices from Park West while onboard the Celebrity ship in 2002 for 1 purchase.  Lee received Invoices from Park West while onboard the Carnival *Liberty* on the following dates:  (1) 9/16/2004 (4 pieces); (2) 9/17/2004 (8 pieces); and (3) 9/18/2004 (8 pieces).  Lee received an Invoice from Park West while attending a land-based auction in Long Island, NY (labeled Uniondale, NY on the Invoice) on 2/11/2005.  Approximately 6 weeks after receiving the Invoices, Lee received at his residence in New York

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 99
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

via U.P.S. or Federal Express the artwork that he purchased from Park West. Approximately 6 weeks after receiving the Invoices, Lee received at his residence in New York via U.P.S. or Federal Express the Certificates of Authenticity for the artwork that he purchased from Park West.  Lee received Appraisals from Park West at his residence via U.S. Mail on or about the following dates:  (1) 9/26/2002; (2)10/29/2004 (1 Appraisal); (3) 11/19/2004 (1 Appraisal); (4) 11/23/2004 (3 Appraisals); (5) 11/24/2004 (1 Appraisal); (6) 11/26/2004 (2 Appraisals); (7) 12/1/2004 (2 Appraisals); (8) 12/8/2004 (1 Appraisal); (9) 12/22/2004 (1 Appraisal); (10) 2/22/2005 (1 Appraisal).

(c)     Bohm and Lee both sent written communications to Park West via U.S. Mail with respect to their dissatisfaction with their purchases on 8/18/2008 and 9/22/2008. Shortly after the August 2008 letter, Bohm received a phone call from a representative from Park West (Leslie) and Bohm told her that he wanted Park West to buy the pieces back for the price that Bohm and Lee paid for them. The Park West representative stated that Park West would not buy them back for the purchase price, but instead offered an exchange.

Mullen

(a)     Mullen received ship itineraries from Royal Caribbean in his stateroom *via* intership mail communicating the Park West events taking place while onboard the *Serenade* in December 2003.  Mullen received ship itineraries from Holland America in his stateroom *via* intership mail communicating the Park West events taking place while onboard the *Zuiderdam* in May 2005.

(b)     Mullen spoke with Park West auctioneers while on board the Royal Caribbean *Serenade* in December 2003 and while on board the Holland America *Zuiderdam* in May 2005. Mullen received Invoices from Park West while onboard the Royal Caribbean ship on 12/4/2003 (3 pieces) and 12/5/2003 (2 pieces).  Mullen received Invoices from Park West while onboard the Holland America ship on 5/23/2005 (2 pieces) and 5/27/2005 (1 piece). Approximately six weeks after receiving the Invoices, Mullen received at his residence in

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 100
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

Washington, D.C. via U.P.S. or Federal Express the artwork that he purchased from Park West. Approximately six weeks after receiving the Invoices, Mullen received at his residence in Washington, D.C. via U.P.S. or Federal Express the Certificates of Authenticity for each of the pieces that he purchased.  Mullen received Appraisals from Park West at his residence in Washington, D.C. via U.S. Mail on the following dates:  (1) 6/22/2005 (1 Appraisal); (2) 6/30/2005 (1 Appraisal); and (3) 8/1/2005 (1 Appraisal).

Allemans

(a)     Bruce and Patricia Alleman purchased cruise tickets for their cruise on *The Enchantment of the Seas* in 2005 using the website *Expedia.com*. The Allemans received a daily itinerary from Royal Caribbean on each day of their cruise while on board the *Enchantment of the Seas* in December 2005.  The Allemans each spoke with the Park West auctioneer numerous times while on board the Royal Caribbean ship in December 2005.

(b)     Bruce Alleman received an Invoice  in December 2005 from Park West while onboard the Royal Caribbean ship for each of his two purchases. Approximately six weeks after the date of the Invoice, the Allemans received the artwork that they purchased from Park West at their Illinois home via U.P.S. or Federal Express.  Approximately six weeks after the date of each Invoice, the Allemans received at their residence in Illinois via U.P.S. or Federal Express the Certificates of Authenticity from Park West for each piece that was purchased. Bruce Alleman received Appraisals at his residence in Illinois via U.S. Mail from Park West on or about January 6, 2006 (2 Appraisals).

(c)     Bruce Alleman opened a Park West Collectors Card in December 2005 while onboard the Royal Caribbean ship.

Conleys

(a)     The Conleys received ship itineraries from Carnival in their staterooms via intership mail communicating the Park West events taking place while they were aboard Carnival in February 2007.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 101
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1       (b)     The Conleys both spoke with the Park West auctioneers onboard the

2  Carnival ship in 2007. Russell Conley received an Invoice from Park West while onboard the

3  Carnival *Sensation* on 2/24/2007 (4 pieces). Melissa Conley received an Invoice from park West

4  while onboard the Carnival *Sensation* on 2/24/2007 (1 piece). Approximately 6 weeks after

5  receiving the Invoice, the Conleys received at their residence in New York via UPS or Federal

6  Express the artwork that they purchased from Park West. Approximately 6 weeks after receiving

7  the Invoice, the Conleys received at their residence in New York via UPS or Federal Express the

8  Certificates of Authenticity for the artwork that they purchased from Park West. The Conleys

9  received Appraisals from Park West at their residence via U.S. Mail on or about the following

10  dates: (1) 3/29/2007 (1 Appraisal); (2) 4/16/2007 (3 Appraisals); (3) 4/24/2007 (1 Appraisal).

11       312.    Additionally, the nature and pervasiveness of the scheme, which was orchestrated

12  out of the U.S. corporate headquarters of each Defendant, necessarily required those

13  headquarters to communicate directly and frequently with each other by the U.S. Mails and by

14  interstate wire facilities.

15       313.    Many of the precise dates of Defendants' uses of the U.S. mails and interstate

16  wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden

17  and cannot be alleged without access to these Defendants' books and records.  Indeed, an

18  essential part of the successful operation of the scheme alleged herein depended upon secrecy.

19  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of

20  mail fraud and wire fraud occurred, and how those acts were in furtherance of the Scheme;

21  Plaintiffs describe this below.

22       314.    The Defendants' use of the U.S. Mails and interstate wire facilities to perpetuate

23  the scheme involved thousands of communications including, but not limited to:

24       (a)     Marketing materials about Park West artwork, which Park West, the

25  Cruise Lines, and Fine Art Sales, sent to consumers, including cruise passengers, located across

26  the country;

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 102
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

(b)	Communications between Defendants and the Cruise Lines regarding the sale of Park West artwork aboard the cruise ships, which occurred on a regular basis each year;

(c)	Communications between Defendants and Fine Art Sales regarding the investment potential and/or authenticity of Park West artwork;

(d)	Communications from Defendants directed to consumers, including cruise passengers, that fraudulently misrepresented the investment potential and/or authenticity of Park West artwork;

(e)	Internet marketing materials from Park West directed to consumers regarding Park West artwork;

(f)	Receipts of increased profits and sales sent through the U.S. mails and interstate wire facilities – the wrongful proceeds of the scheme; and

(g)	Communications, including financial payments, by Park West to the Cruise Lines, in furtherance of the activities of the Enterprises, planning or discussing or relating to the scheduling and conducting of shipboard auctions on the Cruise Lines;

(h)	Communications between Park West and the Cruise Lines and Plaintiffs, including booking and paying for tickets on the Cruise Lines, paying for and mailing the Park West artwork and Appraisals;

(i)	Communications between Park West and the Cruise Lines agreeing to and scheduling the shipboard art auctions;

(j)	Communications between Park West and the Cruise Lines agreeing to and establishing a display area for the artwork for sale at a prominent venue of the ship.

(k)	Communications between and among co-conspirators to collect shared revenues.

(l)	Communications between Park West and various artists and the artists' sales representatives and others around the country in furtherance of their scheme alleged in this Complaint;

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 103
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1    (m)    Defendant Park West maintains a website through which it communicates

2    and continues to communicate with Plaintiffs and others, also using the website to fraudulently

3    conceal its illegal behavior.  *See* www.parkwestgallery.com.

4    (n)    The Cruise Lines also each maintain a website through which it

5    communicates and continues to communicate with Plaintiffs and others, also using the website to

6    fraudulently conceal its illegal behavior.

7    (o)    Defendants' communications with Plaintiffs includes but is not limited to

8    Invoices, shipments of artwork, Certificates of Authenticity, Appraisals, marketing and

9    promotion materials, invitations to land auctions, and complaints.

10    (p)    In addition to the above-referenced RICO predicate acts, it was

11    foreseeable to each Defendant that Park West falsely represented the investment potential and/or

12    authenticity of its artwork through the U.S. mails and by interstate wire facilities.  Further, each

13    Defendant has, in furtherance of the scheme, communicated through use of the U.S. mails and by

14    interstate wire facilities with their various local headquarters or divisions.

15    315.    Defendants' policies, practices and acts described above constitute wire fraud

16    under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341, in that they constitute or are in

17    furtherance of a scheme or artifice to defraud or obtain money by means of false or fraudulent

18    pretenses, furthered or executed through Defendants' transmission of writings, signals, or data by

19    means of wire.

20    316.    By selling and promoting the sale of artwork that is falsely represented as a good

21    investment or of certain appraisal value, and that the price paid would be "significantly below

22    market value," and as being a good investment, authentic or having authorship that it does not in

23    fact have to unwitting consumers such as Plaintiffs and the Class, through the course of conduct

24    described above, Defendants have committed wire fraud and mail fraud thousands or tens of

25    thousands of times since at least 1993 and thus engaged in a "pattern of racketeering activity"

26    within the meaning of 18 U.S.C. § 1961(5).

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 104
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

317.     Defendants have used a structure separate and apart from their acts of wire fraud to distribute the proceeds of the transactions.  In particular, for each Park West piece sold onboard the Cruise Lines, the cruise lines received a commission, fee or other remuneration.  In return, Park West received the promotion, advertising and channeling of its wares to Cruise Line passengers.

**C.      Conduct of the RICO Enterprises' Affairs**

318.     Defendants violated 18 U.S.C. § 1962(c) in that they are associated with the Enterprises which are engaged in, or the activities of which affect, interstate or foreign commerce, and have conducted or participated, directly or indirectly, in the conduct of such Enterprises' affairs through a pattern of racketeering activity.  Defendants have exerted control over the Enterprises, in violation of Section 1962(c) of RICO, in the following ways:

(a)      Defendants had a degree of control concerning the selling and promoting of Park West artwork;

(b)      Defendants have directly controlled the creation and distribution of marketing, sales, and other materials used to inform Plaintiffs and the Class as to the value of its artwork;

(c)      Defendants intended that the Cruise Lines would (and did) distribute their publications containing false representations about Park West artwork through the U.S. mails and by interstate wire facilities; and

(d)      The Cruise Lines allowed Park West to exert control over their art sale organizations knowing that the values of the artwork were materially inflated as a result of the scheme and were valued at significantly less.  The Cruise Lines knew of the large volume of paintings alleged to be Rembrandts, Dalis, Picassos, and other noted artists being sold and knew that there could not be such a volume of legitimate works by those painters.

**D.     The Defendants' Pattern of Racketeering Activity**

319.    Defendants conducted and participated in the affairs of the Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  Defendant's pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendants intended to defraud Plaintiffs and the Class.

320.    The Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to defraud Plaintiffs and the Class.  Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and the Class.  Each Defendant has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprises.

321.    Defendants calculated and intentionally crafted the scheme to ensure that Plaintiffs and Class members would pay prices for artwork that was materially inflated because of the fraud.  In designing and implementing the scheme, at all times the Defendants were cognizant of the fact that the artwork sold by Park West was falsely represented as authentic and a good investment.

322.    By intentionally and artificially inflating the prices of Park West artwork by selling worthless reproductions as fine art and by subsequently failing to disclose such practices to the purchasers and consumers generally, the Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 106
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

323.    The Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and the Class.  Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and the Class.

### E.    Damages Caused by the Defendants' Scheme

324.    The Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and the Class to be injured in their business or property because Plaintiffs and the Class have paid inflated payments for artwork purchased at the Cruise Lines' auctions that was falsely represented as authentic, a good investment that would appraise for many times the hammer price or was overvalued as described herein, such that they would not have paid had Defendants not engaged in their pattern of racketeering activity.

325.    Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

### COUNT II

### FOR COMPENSATORY AND EXEMPLARY DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF UNDER UNFAIR AND DECEPTIVE TRADE PRACTICES STATUTES OF MICHIGAN AND NEW YORK[16]

326.    Plaintiffs repeat and reallege the preceding paragraphs as though set forth herein.

327.    This Count II is brought against Scaglione and Park West for purchases of artwork from Park West's land sales in Michigan and New York States and for purchases of corresponding phony Appraisals created by Scaglione or Park West.

---

[16]    The Court dismissed these claims. (Dkt. No. 199, 200, 204, 205), but Plaintiffs are keeping these claims in thier entirety solely for the purposes of appeal.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 107
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1  328.   Scaglione's and Park West's conduct described herein constitutes prohibited

2  practices, unfair, deceptive and unconscionable conduct under the unfair and deceptive trade

3  practices acts of the states, as follows:

4  (a)   Michigan:  Michigan Consumer Protection Act, §§ 445.901, *et seq.;* MI

5  Fine Art Statutes, Mich. Comp. Laws § 4424321 *et seq.*

6  (b)   New York:  The aforementioned practices by Park West were and are in

7  violation of the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et*

8  *seq.*;

9  329.   Under statutes enacted in these states to protect consumers against unfair,

10  deceptive, fraudulent and unconscionable trade and business practices and false advertising,

11  Plaintiffs and Class members are consumers who purchased Park West artwork and Appraisals

12  signed by Scaglione or Park West and are therefore subject to protection under such legislation.

13  330.   Under the statues enacted in these states to protect consumers against unfair,

14  deceptive, fraudulent and unconscionable trade and business practices and false advertising,

15  Defendants are suppliers, manufactures, advertisers, and sellers who are subject to liability under

16  such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

17  331.   Scaglione and Park West violated the statutes enacted in these states to protect

18  consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices

19  and false advertising, by knowingly and falsely representing that Park West artwork was a good

20  investment, authentic and valuable, when in fact it was not, by selling Plaintiffs phony

21  Appraisals signed by Scaglione or Park West and by other acts alleged herein.  These

22  representations were made in uniform promotional materials.

23  332.   Scaglione and Park West violated the statutes enacted in these states to protect

24  consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices

25  and false advertising, by omitting material information concerning the true nature of the practices

26  of Scaglione and Park West and their artwork and Appraisals.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 108
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

333.   Plaintiffs and Class members justifiably relied upon Scaglione's and Park West's misrepresentations and/or omissions (as described herein) in purchasing Park West artwork and Appraisals, believing that Park West had superior knowledge and judgment.

334.   The actions of Scaglione and Park West alleged herein are uncured or incurable deceptive acts under the statutes enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

335.   Scaglione and Park West had actual knowledge of the true nature of the phony Appraisals and Park West artwork being sold as authentic and valuable, and failed to take any action to adequately inform Plaintiffs and the Class of material information regarding the fact that the artwork was in fact worthless or overvalued and that the Appraisals were phony, well in excess of thirty (30) days before the Plaintiffs and the Class did or could have possessed any such knowledge.

336.   As a direct result of Scaglione's and Park West's violations of the statutes enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Plaintiffs and the Class have been damaged by, *inter alia,* paying a premium price for phony artwork and Appraisals.

337.   Plaintiffs and the Class members are therefore entitled to and hereby seek compensatory damages, multiple damages, and equitable and declaratory relief and any and all other available remedies according to proof.

338.   As a direct and proximate result of Scaglione's and Park West's wrongful conduct, Plaintiffs and the Class are entitled to attorneys' fees and cost of this suit.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 109
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

# COUNT III

## VIOLATION OF MICHIGAN FINE ART STATUTE[17]

339.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

340.    This Count III is alleged against the Defendants.

341.    Plaintiffs and the Class bid on and purchased artwork at land based art auctions, based on the descriptions and representations made by Defendants as to the authorship, authenticity, genuineness and value of the artwork.  Defendants made statements with respect to the authorship, authenticity, genuineness and value of the artwork both verbally and in writing, and Plaintiffs and the Class received an Invoice, Certificate of Authenticity and/or an Appraisal setting forth Park West's representations.

342.    Defendants' statements regarding the authorship, authenticity, genuineness and/or value of the artwork purchased by Plaintiffs and the Class created an express warranty as to the accuracy of those statements by virtue of the statutes listed below.  Defendants intentionally and deliberately made misleading statements to Plaintiffs and the Class that the artwork they purchased was of a particular authorship, authenticity, genuineness and/or value, when Defendants knew or should have known that the descriptions of the artwork provided to Plaintiffs and the Class were not accurate and/or were misleading.

343.    Defendants made intentionally misleading and/or false statements to Plaintiffs and the Class in their description of the artwork Plaintiffs and the Class purchased in violation of Mich. Comp. Laws § 442.321, *et seq.*

---

[17] The Court dismissed Plaintiffs' claims under the Michigan Art Multiple Sales Act § 442.351 *et seq.* (Dkt. No. 199, 200, 204, 205), but Plaintiffs are keeping this claim in its entirety solely for the purposes of appeal.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 110
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

344.    Defendants made intentionally misleading and/or false statements to Plaintiffs and the Class in their description of the artwork Plaintiffs and the Class purchased in violation of Mich. Comp. Laws § 442.351, *et seq.*

345.    The authorship, authenticity, genuineness and value of the artwork purchased by Plaintiffs and the Class are characteristics that are essential to the identity of the goods sold.

346.    Defendants intentionally and in bad faith misrepresented the authorship, authenticity, genuineness and/or value of the artwork purchased by Plaintiffs and the Class.

347.    Plaintiffs and the Class relied upon Defendants' misrepresentations and omissions in purchasing artwork and Appraisals at land-based art auctions.  Plaintiffs and the Class relied upon the misrepresentations and omissions in paying for the artwork and Appraisals.

348.    Defendants failed to deliver artwork to Plaintiffs and the Class that conformed to its own description of such goods.

349.    As a direct and proximate result of the foregoing, Plaintiffs and the Class were damaged in an amount to be determined at trial.

## COUNT IV

## ADMIRALTY – FEDERAL COMMON LAW FRAUD

350.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

351.    This Count IV is alleged against all Defendants and DOES I through X.

352.    Defendants engaged in a uniform course of conduct that misrepresented to Plaintiffs and the Class that the artwork that they sold to Plaintiffs and the Class was fine art, misrepresented the provenance of the artwork, and misrepresented that the artwork would immediately appraise for "many more times" what Plaintiffs paid for it and that the artwork was sold for a price that was "significantly below market value" and misrepresented the validity and value of the Appraisals.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 111
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

353.     Compared to Plaintiffs and the Class, Defendants have special skill, judgment or objectivity with respect to the value, authenticity and appraising of artwork.  And based on Defendants' statements and Appraisals as to value, Plaintiffs and the Class reasonably believed that Defendants had special skill, judgment and judgment regarding the value of the artwork.

354.     These misrepresentations were material to the purchase of the artwork, and, had Defendants not made such misrepresentations, Plaintiffs would not have purchased the art.

355.     Defendants knew that the artwork was not original, not authentic, of doubtful provenance, not a good investment and would not and could not appreciate in value, and was not sold at a price "significantly below market value."  Defendants also knew that the Appraisals that Defendants sold to Plaintiffs and the Class were not independent and did not represent the true value of the artwork, and that the artwork only appraised for above the hammer price because Scaglione or Park West appraised it.

356.     Defendants made misrepresentations in order to induce Plaintiffs and the Class into purchasing the artwork and Appraisals that Defendants sold.  The Appraisals were designed to lull Plaintiffs and the Class into believing that the artwork purchased was worth materially more than what was paid and to forestall lawsuits against Defendants.

357.     Plaintiffs and the Class purchased the artwork and Appraisals from Defendants because of the misrepresentations made by Defendants that the artwork was a good investment and would appraise for "many more times" what they were paying for it.  Had Plaintiffs and the Class known the truth about the actual investment value of the artwork and value of the Appraisals, Plaintiffs and the Class would not have purchased the artwork from Defendants.

358.     Because of Defendants' misrepresentations, Plaintiffs and the Class suffered injury and were damaged..

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 112
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

**COUNT V**

**ADMIRALTY - COMMON LAW AIDING AND ABETTING FRAUD**

359.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the previous paragraphs as if fully set forth herein.

360.    This Count V is alleged against FASI, Vista, PWG FL and Scaglione as an alternative to Count IV.

361.    As alleged above, Park West perpetrated a fraud on Plaintiffs and the Class.

362.    FASI, Vista, PWG FL and Scaglione knew about the fraud perpetrated on Plaintiffs and the Class by Park West.

363.    FASI, Vista, PWG FL and Scaglione intended to and did facilitate Park West in defrauding Plaintiffs and the Class.

364.    FASI, Vista, PWG FL and Scaglione assisted and aided and abetted Park West in perpetrating the fraud alleged above, as detailed herein.

365.    As a result of PWG's misrepresentations and the aiding and abetting PWG by FASI, Vista, PWG FL and Scaglione, Plaintiffs and the Class were injured and suffered damages.

**COUNT VI**

**UNJUST ENRICHMENT**

366.    Plaintiffs incorporate by reference all proceeding paragraphs as if fully set forth herein.

367.    This Count VI is brought against all Defendants.

368.    As the intended and expected result of Defendants' conscious wrongdoing as set forth in this Complaint, Defendants profited and benefitted from payments Plaintiffs and the Class made to them for artwork and Appraisals purchased at shipboard auctions operated by the Cruise Lines and at land-based auctions.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 113
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

369.    Defendants voluntarily accepted and shared these payments with full knowledge and awareness that, as a result of their wrongdoing, Plaintiffs and the Class paid for artwork when they otherwise would not have done so.

370.    An inequity resulted to Plaintiffs because Defendants kept the benefit and were unjustly enriched.

371.    Plaintiffs and the Class are entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent, and in the amount, deemed appropriate by the Court and such other relief as the Court deems just and proper.

## COUNT VII

## AGENCY AND CIVIL CONSPIRACY

372.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

373.    This Count VII is alleged against all Defendants.

374.    Defendants engaged in a concerted action to accomplish the fraud described in this Complaint.

375.    Defendants were the agents, principals, employees, servants, partners, joint ventures, and representatives of each other.  In doing the acts alleged, they each were acting within the scope and course of their authority as such agents, principals, employees, servants, partners, joint ventures, and representatives, and were acting with the permission and consent of the other Defendants.

376.    Defendants' overt acts as detailed herein result in the plausible inference that Defendants intentionally agreed to defraud Plaintiffs and the Class.

377.    Defendants had knowledge and agreed to the misconduct alleged herein. Defendants conspired with each other to engage in the common course of misconduct alleged herein, or aided and abetted that common course of misconduct, for the purpose of enriching themselves at the public's expense, resulting in damage to Plaintiffs and the Class.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 114
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

378.    As a direct and proximate result of this wrongful conspiracy, Plaintiffs and the Class suffered ascertainable injury and were damaged in an amount to be determined at trial.

## COUNT VIII

## DECLARATORY JUDGMENT

379.    Plaintiffs repeat and reallege the preceding allegations as if fully stated herein.

380.    Plaintiffs bring this Count VIII against all Defendants.

381.    At all times relevant hereto, there was in full force and effect the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* (the "DJA").

382.    Under Section 2201 of the DJA, "in a case of actual controversy within its jurisdiction …, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal remedies of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

383.    The claims of Plaintiffs and the Class alleged herein constitute a case of actual controversy within the meaning of Section 2201(a), *supra.*

384.    This Court may, and should, declare the rights and legal remedies of Plaintiffs and Class members vis-à-vis Defendants and its unlawful sales practices described herein.  Namely, Plaintiffs and the Class seek a declaration that:

(a)    Plaintiffs and Class members were promised but did not receive artwork with the same investment value, authorship, authenticity and genuineness represented by Park West; and

(b)    Defendants owed Plaintiffs and the Class an affirmative duty to disclose the material fact that the artwork they purchased did not have the investment value, authorship, authenticity or genuineness promised.

385.    Plaintiffs are entitled to a permanent injunction requiring Defendants to notify in writing all prospective purchasers of Park West artwork the true investment value, authorship, authenticity and genuineness, or lack thereof, of the work being sold.

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 115
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

386.     Plaintiffs have no adequate remedy at law which would accomplish the relief sought herein.

## COUNT IX

## INJUNCTION

387.     Plaintiffs repeat and reallege the preceding allegations as if fully stated herein.

388.     Plaintiffs bring this Count IX against all Defendants

389.     This Court may and should enter an injunction to prohibit Defendants from engaging in their fraudulent and deceptive practices described in this Complaint and more particularly from representing, stating or implying in connection with the sale of artwork, that the artwork is a "good investment" or has "investment value" or "will appraise immediately for many times the purchase/hammer/bid price" or that is sold at a price that is "significantly below market value."

390.     This Court may and should enter an injunction to prohibit Defendants from furnishing Appraisals to purchasers that do not comply with the Uniform Standards of Professional Appraisal Practice ("USPAP") or some other approved standard of appraisal practice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class demand judgment against Defendants in each claim for relief, jointly and severally, as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class defined herein;

B.     Designating Plaintiffs as representatives of the Class and their counsel as Class counsel;

C.     Requiring Defendants to refund and make restitution of all monies acquired from the sale of artwork and Appraisals at shipboard auctions on the Cruise Lines and from land-based auctions to Plaintiffs and the Class;

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 116
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1       D.     Requiring Defendants to only provide Appraisals that meet the Uniform Standards

2   of Professional Appraisal Practice or some other approved standard of appraisal practice;

3       E.     Awarding compensatory damages in favor of Plaintiffs and the Class against all

4   Defendants, jointly and severally, for all damages sustained as a result of Defendants'

5   wrongdoing, in an amount to be proven at trial, including interest thereon;

6       F.     Awarding Plaintiffs and the Class restitution and/or disgorgement and other

7   equitable or injunctive relief as the Court deems appropriate;

8       G.     Awarding treble damages;

9       H.     Entering an injunction barring Defendants from engaging in the unlawful conduct

10  alleged herein;

11      I.     Awarding Plaintiffs their reasonable costs and expenses incurred in this action,

12  including counsel fees and expert fees; and

13      J.     Awarding Plaintiffs and the Class such other and further relief as the Court may

14  deem just and proper.

15                        **JURY DEMAND**

16      Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs demand a trial by jury on all

17  issues so triable.

18      Dated:  September 27, 2010

19                      Respectfully submitted,

20

21                      By s/ Steven A. Schwartz
                          Steven A. Schwartz, Pa Bar No. 50579

22                        Denise Davis Schwartzman, Pa Bar No. 40659
                          Kimberly A. Evans, Pa Bar No. 206431

23                      CHIMICLES & TIKELLIS LLP
                        361 West Lancaster Avenue

24                      Haverford, PA 19041
                        Telephone: (610) 642-8500

25                      Facsimile: (610) 649-3633
                        Email:   sas@chimicles.com

26                                 dds@chimicles.com
                                   kae@chimicles.com

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 117
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

E. Powell Miller
Christopher D. Kaye
MILLER LAW FIRM, PC
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone:  (248) 841-2200
Email: epm@millerlawpc.com
          cdk@millerlawpc.com

*Attorneys for Plaintiffs and the Proposed Class*

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

1

## <u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on September 27, 2010, I electronically filed the foregoing with the

3   Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4   following:

5        **Bevin Allen,** ballen@kpalawyers.com

6        **Ivy D. Arai**, ivy@hbsslaw.com

7        **Matt C. Bailey**, mbailey@kpalawyers.com

8        **Steve W. Berman**, steve@hbsslaw.com

9        **Sandford L. Bohrer**, sbohrer@hklaw.com

10       **Robert Kent Burlington**, rburlington@coffeyburlington.com

11       **Scott Allen Burr**, sburr@cfclaw.com

12       **Stephania Camp Denton**, sdenton@mms-seattle.com

13       **Robert J. Drexler, Jr.**, rdrexler@kpalayters.com

14       **Joshua Michael Entin**, jentin@kpalawyers.com

15       **Kimberly A. Evans**, kimberlyevans@chimicles.com

16       **Herschel P. Fink**, hpf@honigman.com

17       **Caryn Geraghty Jorgensen**, cjorgensen@mms-seattle.com

18       **Christopher D. Kaye**, cdk@millerlawpc.com

19       **Shawn Khorrami**, skhorrami@kpalawyers.com

20       **Timothy G. Leyh**, timl@dhlt.com

21       **Alice Evelyn Meyer**, ameyer@coffeyburlington.com

22       **E. Powell Miller**, epm@millerlawpc.com

23       **Dylan F. Pollard**, dpollard@kpalawyers.com

24       **Scott D. Ponce**, sponce@hklaw.com

25       **Jaye Quadrozzi**, efiling@youngpc.com

26       **David M. Schoeggl**, dschoeggl@mms-seattle.com

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 119
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

**Steven A. Schwartz**, sas@chimicles.com

**Denise Davis Schwartzman**, dds@chimicles.com

**Paul Joseph Schwiep**, pschwiep@coffeyburlington.com

**William M Sweetnam**, wms@sweetnamllc.com

**Morgan Lowery Swing**, mswing@coffeyburlington.com

**Randall Thor Thomsen**, randallt@dhlt.com

**Rodger D. Young**, efiling@youngpc.com

DATED:  September 27, 2010

/s/ Steven A. Schwartz
STEVEN A. SCHWARTZ
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: 610-642-8500
Facsimile: 610-649-3633
Email: sas@chimicles.com

THIRD AMENDED AND CONSOLIDATED CLASS ACTION
COMPLAINT - 120
Case No. CV9-1178-RSL

CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633